KENNETH KAVANAGH vs. TRUSTEES OF BOSTON UNIVERSITY
& another.[1]

Suffolk. April 8, 2003. - September 19, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Education,* Private colleges and universities. *Negligence,* College, Vicarious
Liability, Athletics, Duty to prevent harm, Foreseeability of harm.

In a tort action brought by a basketball player struck during an intercollegiate
game by an opposing university team's scholarship athlete, the university
was not vicariously liable under the doctrine of respondeat superior for the
actions of its scholarship athlete, where that student was not an employee
or agent of the university. [198-201]
This court concluded that a university had no duty to protect an opposing
team's player from harm inflicted by one of the university's student athletes
in an intercollegiate basketball game; further, neither the university nor its
coach had any reason to foresee that its player would engage in violent
behavior, and the plaintiff failed to demonstrate that the university's coach
engaged in reckless conduct rather than aggressive coaching. [201-206]

CIVIL ACTION commenced in the Superior Court Department on
May 6, 1999.

A motion to dismiss was heard by *Mitchell J. Sikora,* J.; the
case was heard by him on a motion for summary judgment; and
final judgment was entered by *Peter M. Lauriat,* J.

The Supreme Judicial Court granted an application for direct
appellate review.

*Michael J. O'Reilly* for the plaintiff.

*Lawrence S. Elswit* for the defendants.

SOSMAN, J. Having been punched by an opposing Boston
University player during an intercollegiate basketball game, the
plaintiff brought suit against the trustees of Boston University
(university) and the coach of the university's team, contending
that the university was vicariously liable for the conduct of its
"scholarship athlete," and that the university and its coach were

[1] Dennis Wolff.

negligent in that they "took no steps to prevent this act." Against the coach, Kavanagh also alleged both negligent and intentional infliction of emotional distress. A judge in the Superior Court dismissed the counts alleging vicarious liability and intentional infliction of emotional distress, and granted the defendants' motion for summary judgment on the remaining counts for negligence and negligent infliction of emotional distress. Kavanagh appealed, and we granted the defendants' application for direct appellate review. We now affirm.

1. *Facts.* On December 22, 1998, the university hosted a men's intercollegiate basketball game against Manhattan College. The plaintiff, Kenneth Kavanagh, was a member of the Manhattan College team. Following a contested rebound during the second half, the referee blew his whistle to signal a foul, and some elbowing and shoving ensued among a few of the competing players. When Kavanagh intervened to break up a developing scuffle between one of his teammates and a university player, he was punched in the nose by another university player, Levar Folk. Folk was immediately ejected from the game. Kavanagh was treated for what turned out to be a broken nose and returned to play later in the same game.

At the time of this incident, Folk was in his senior year. He had been recruited for the university's basketball team by its coach, Dennis Wolff, and came to the university on a full athletic scholarship. As part of the recruitment process, Wolff had met with Folk's high school coaches, who described Folk as a "good kid" and expressed no reservations about his character or comportment on the basketball court. Until the incident involving Kavanagh, Folk had not been involved in any physical altercation during a game and had never been ejected from a game. He had no prior history of physical confrontations or fights with either his own teammates or opposing players.

In his junior year, one year prior to the assault on Kavanagh, Folk had had an argument with Coach Wolff about his manner of play (Wolff believed that Folk was taking too many shots) and about an academic issue (Wolff was concerned that Folk had missed an examination and had tried to secure an excuse for having done so). The argument was heated, but involved no physical contact. Wolff suspended Folk for a period of several

Kavanagh v. Trustees of Boston University.

games, and Folk resumed team play thereafter without incident until the December, 1998, game against Manhattan College.

Folk's disciplinary history with the university included the imposition of two periods of "residence probation" for violation of the university's policies on noise and alcohol. Neither infraction involved any act of violence or threatened violence.[2]

Although Kavanagh characterizes the December 22, 1998, game as "the most physical" he ever played, the number of penalties called by the referees was within a normal range. Up until the time he struck Kavanagh during the second half, no technical fouls had been called on Folk, and no university players had been ejected. Kavanagh describes the university team's play as follows: "with reckless abandon," "elbows to people's faces, trying to steal the ball," "after plays, bumping people," "holding you with both their hands, walking by, getting the elbow." He also claimed that Coach Wolff incited the team's aggressiveness by yelling encouragement from the sideline, not substituting for players who were allegedly elbowing opposing players, and calling out praise for his players, despite the fact that they were, in Kavanagh's view, committing fouls.[3] Wolff denied that he had ever instructed Folk (or any other player) to hit or fight with any opposing player, and Kavanagh presented no contrary evidence.

Pursuant to National Collegiate Athletic Association (NCAA) rules, Folk was automatically suspended from the following game. No form of penalty or discipline was imposed on the university team, on Coach Wolff, or on any of his assistants.

---

[2]Specifically, the first incident, on March 7, 1998, involved Folk consuming alcohol while at another student's dormitory apartment. Neighbors had complained of students making noise and throwing bottles and cans out the window. Folk, who was not yet of age to consume alcohol legally, admitted that he had been drinking, but denied any involvement in throwing things out the window. The second incident, on October 25, 1998, arose when Folk was hosting two basketball recruits in his dormitory apartment. While Folk was running an errand, his guests turned up the volume on his stereo to the point that one of the speakers was damaged and neighbors complained about the noise. Folk also had alcohol in his apartment in an amount that exceeded that allowed by the university's policies. (By then, Folk was of legal drinking age.)

[3]In his deposition, Kavanagh identified two offending players who were allegedly being praised by their coach. Neither of them was Folk.

When Wolff talked to Folk about the incident sometime after the game, Folk's explanation for his misconduct was that he "lost it."

2. *Discussion.* a. *Vicarious liability.* Kavanagh contends that Folk's status as a scholarship athlete playing for the university made him an agent of the university and that the university is therefore vicariously liable for any torts committed by Folk while playing for the university's basketball team. We reject the proposition that the doctrine of respondeat superior renders schools liable for the acts of their students, and decline to treat scholarship students any differently from paying students for these purposes.

"Broadly speaking, respondeat superior is the proposition that an employer, or master, should be held vicariously liable for the torts of its employee, or servant, committed within the scope of employment." *Dias* v. *Brigham Med. Assocs., Inc.,* 438 Mass. 317, 319-320 (2002), citing Restatement (Third) of Agency § 2.04 (Tent. Draft No. 2 2001). In determining whether an employer-employee relationship exists, various factors are to be considered, including "the method of payment (e.g., whether the employee receives a W-2 form from the employer), and whether the parties themselves believe they have created an employer-employee relationship." *Id.* at 322, citing Restatement (Second) of Agency § 220 (2) (1958).

A student's status as student does not, by itself, make the student an "employee" or "servant" of the school the student attends.[4] Neither party understands the student's relationship with the school to be one of employment. Students attend school to serve their own interests, not the interests of the school. "The student is a buyer of education rather than an agent. . . . [A] student retains the benefit of that education for himself rather than for the university." *Hanson* v. *Kynast,* 24 Ohio St. 3d 171, 174 (1986) (member of university lacrosse team not "agent" of university). While schools may benefit in various ways from the presence of a particular student, or may benefit

---

[4]There are times, of course, when schools do hire students to perform services for the school (for example, work in a school cafeteria or maintenance work), and a school could be vicariously liable for the torts of such a student employee committed within the scope of that employment.

in the future from a former student's later success, the student does not attend school to do the school's bidding. Kavanagh has cited no authority for the proposition that the relationship between school and student is that of principal and agent, master and servant, or employer and employee.

The fact that a college or university has facilitated a student's ability to attend that institution by providing a scholarship or other financial assistance does not transform the relationship between the academic institution and the student into any form of employment relationship. While scholarships may introduce some element of "payment" into the relationship, scholarships are not wages. See *Rensing* v. *Indiana State Univ. Bd. of Trustees*, 444 N.E.2d 1170, 1173 (Ind. 1983) (noting that NCAA rules prohibit payment to student athletes and that proceeds of athletic scholarships are not taxable as income). Rather, scholarships pay specific forms of expenses that the student would incur in attending school — tuition, books, room and board — and thereby provide the student with an education. Nor does a scholarship student "work for" the school in exchange for that scholarship. The benefits that may accrue to a school from the attendance of particularly talented athletes is conceptually no different from the benefits that schools obtain from the attendance of other forms of talented and successful students — both as undergraduates and later as alumni, such students enhance the school's reputation, draw favorable attention to the school, and may increase the school's ability to raise funds. A school recruits and provides financial aid to students that it thinks will be good for the school in some respect, and the fact that a particular recruited scholarship student may provide the expected benefit to the school does not affect the nature of the school's legal relationship with the student. Again, scholarship or financial aid notwithstanding, neither side understands the relationship to be that of employer-employee or principal-agent. Thus, in various contexts, courts have rejected the theory that scholarship athletes are "employees" of their schools. See *State Compensation Ins. Fund* v. *Industrial Comm'n of Colo.*, 135 Colo. 570 (1957) (rejecting workers' compensation claim stemming from injury to student athlete, reasoning that student attending school under athletic scholarship is not "employee");

*Rensing* v. *Indiana State Univ. Bd. of Trustees, supra* (same); *Coleman* v. *Western Mich. Univ.*, 125 Mich. App. 35 (1983) (same); *Korellas* v. *Ohio St. Univ.*, 121 Ohio Misc. 2d 16 (Ct. Cl. 2002) (scholarship athlete not "employee" of State university for purposes of statute immunizing public employees from suit).

It is undeniable that a successful athletic program, particularly in popular sports like basketball, can garner substantial revenues for colleges and universities, both directly from the sporting activities themselves (e.g., gate receipts, sale of broadcasting rights) and indirectly from the attention those activities attract (e.g., increased alumni giving). In recent years, the enormity of the revenues at stake in collegiate sports has prompted some to recommend that colleges and universities be allowed to compensate student athletes for their "services" and thereby transform them into employees. See Goldman, Sports and Antitrust: Should College Students Be Paid to Play?, 65 Notre Dame L. Rev. 206 (1990); Whang, Necessary Roughness: Imposing a Heightened Duty of Care on Colleges for Injuries of Student-Athletes, 2 Sports Law. J. 25, 36-38 (1995).[5] It is recognized, however, that the current relationship of a player to a school remains that of scholarship student, not employee. Goldman, *supra* at 251; Whang, *supra* at 37-38; Comment, Do Universities Have a Special Duty of Care to Protect Student-Athletes from Injury?, 6 Vill. Sports & Ent. L.J. 219, 226 (1999).

Kavanagh argues that scholarship athletes should nevertheless be treated as "agents" of their schools because it is said that they "represent" their schools. When one speaks of an athlete, or any other student, as a "representative" of his or her school, the term is not being used in its legal sense. Rather, it connotes

---

[5]Other commentators suggest different approaches to address the vast discrepancy between the revenues schools receive on account of their star athletes and the value of the scholarships granted to those athletes, many of whom never graduate. See T. Davis, Examining Educational Malpractice Jurisprudence: Should a Cause of Action Be Created for Student-Athletes?, 69 Denv. U.L. Rev. 57 (1992) (recommending that student athletes should have cause of action for schools' failure to provide them with adequate education); R. Davis, Academics and Athletics on a Collision Course, 66 N.D. L. Rev. 239 (1990) (recommending overhaul of NCAA rules to place primary importance on academics and reduce financial rewards to schools).

only that a student's performance will reflect on the school and will be seen as indicative of the school's quality. Students do not "represent" their schools in the sense of being able to bind their schools to agreements, or to act on behalf of their schools. That Folk and his teammates "represented" the university whenever they competed, in the sense of demonstrating the school's capability to field competent and sportsmanlike teams, did not make the university vicariously liable for any torts committed by players in the course of competition.

b. *Negligence.* Kavanagh also claims that the university breached a duty to protect him from the allegedly foreseeable assault and battery by Folk. He acknowledges that, as a general rule, there is no duty to protect another from the criminal conduct of a third party. See *Luoni* v. *Berube*, 431 Mass. 729, 731 (2000); *Anthony H.* v. *John G.*, 415 Mass. 196, 200 (1993); *Mullins* v. *Pine Manor College*, 389 Mass. 47, 50 (1983). However, such a duty arises when there is a "special relationship" between the defendant and the injured victim. See *Luoni* v. *Berube, supra* at 731-732, and cases cited. "[S]pecial relationships exist in several situations, based either on responsibilities imposed by statute or common law (or both). A special relationship, when derived from common law, is predicated on a plaintiff's reasonable expectations and reliance that a defendant will anticipate harmful acts of third persons and take appropriate measures to protect the plaintiff from harm." *Id.* at 732. See Restatement (Second) of Torts § 314A (1965) (one "who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection" has special relationship giving rise to duty to aid or protect). Kavanagh contends that his status as a student athlete on an opposing team created such a special relationship between himself and the university.

In recent years, courts and commentators have taken differing views as to what duties schools have to the scholarship athletes that they have recruited. Some are of the view that the unequal bargaining power in the recruitment process, the degree of influence that a school and its coaches have over a student athlete's daily life, the pressures placed on student athletes to win at all costs (which may cause some students to risk their own health

and safety), and the enormous sums of money schools now reap from their successful teams, are such that schools should be deemed to have a "special relationship" with their own scholarship athletes and a corresponding duty to protect those athletes from injury. See *Kleinknecht* v. *Gettysburg College*, 989 F.2d 1360, 1366-1369 (3d Cir. 1993); *Davidson* v. *University of N.C. at Chapel Hill*, 142 N.C. App. 544, 554-557 (2001); Whang, Necessary Roughness: Imposing a Heightened Duty of Care on Colleges for Injuries of Student-Athletes, 2 Sports L.J. 25, 39-44 (1995); Comment, Do Universities Have a Special Duty of Care to Protect Student-Athletes from Injury?, 6 Vill. Sports & Ent. L.J. 219, 224-229 (1999); Note, Malpractice During Practice: Should NCAA Coaches Be Liable for Negligence?, 22 Loy. L.A. Ent. L. Rev. 613, 625-635 (2002); Comment, The Special Relationship Between Student-Athletes and Colleges: An Analysis of a Heightened Duty of Care for the Injuries of Student-Athletes, 7 Marq. Sports L.J. 329, 338-342 (1996). Others have rejected that theory on the ground that there is "nothing different about a student athlete's relationship with a university which would justify the conclusion that a student athlete is a custodial ward of the university while the non-athlete student is an emancipated adult." *Orr* v. *Brigham Young Univ.*, 960 F. Supp. 1522, 1528 (D. Utah 1994), aff'd, 108 F.3d 1388 (10th Cir. 1997). Cf. *Howell* v. *Calvert*, 268 Kan. 698, 701-702 (2000) (no error in judge's refusal to instruct that college owed heightened duty of care to its student athletes).

For purposes of this case, we need not enter that debate, as none of the authorities favoring such a "special relationship" has opined that that relationship extends to athletes from another school. Here, the university did not recruit Kavanagh; Kavanagh did not depend on the university nor the university on him for any benefit; and the university did not exert any form of control or influence over Kavanagh, or affect his ability or motive to protect himself.[6] See *Fox* v. *Supervisors of La. State Univ.*, 576 So. 2d 978, 981-982 (La. 1991) (no special relationship between

---

[6]With respect to any reasonable expectations as to who will protect competitors from excessively rough play or violence during a game, one would ordinarily expect that the referees would perform that function, not the opposing coach, team, or school. It could be argued that players reasonably rely on game officials to protect them from the type of harm at issue here, and Ka-

school hosting rugby tournament and member of another school's club). In short, Kavanagh had no relationship with the university, special or otherwise, and the sources he cites would, if accepted as law here in Massachusetts, place a duty on his own school, Manhattan College, not on the university.

Kavanagh's negligence claim also fails on the ground that any duty to protect him from the harm of another's criminal acts extends only to those acts that are reasonably foreseeable. See *Poskus* v. *Lombardo's of Randolph, Inc.*, 423 Mass. 637, 639-640 (1996), and cases cited. However, "where there has been a showing that the risk of a criminal assault is foreseeable, the exact nature and source of the assault need not be shown in order for liability to attach." *Foley* v. *Boston Hous. Auth.*, 407 Mass. 640, 645 (1990). In a general sense, one can always foresee that, in the thrill of competition and the heat of battle inherent in a contact sport, any player might some day lose his or her temper and strike an opposing player. If that possibility alone sufficed to make an assault on the field of play reasonably "foreseeable," schools and coaches would face liability every time they allowed their enthusiastic players to take the field against an opposing team. For these purposes, foreseeability must mean something more than awareness of the ever-present possibility that an athlete may become overly excited and engage in physical contact beyond the precise boundaries of acceptably aggressive play. Rather, a defendant would have to have specific information about a player suggesting a propensity to engage in violent conduct, or some warning that a player or players appeared headed toward such conduct as the game progressed. See *Brown* v. *Day*, 68 Ohio App. 3d 447, 449-450 (1990) (coach not liable for negligent supervision of player who kicked opposing player in absence of prior examples of violent behavior on part of offending player). See also *Hanson* v. *Kynast*, 24 Ohio St. 3d 171, 179 (1986) (Holmes, J., concurring) ("to state a cause of action against a university for injuries caused by one of its athletes, one must, at the very least, allege

vanagh suggests in his deposition that the referees repeatedly failed to call fouls on offending university players. However, Kavanagh did not bring any claims against the referees, and we need not address whether our common law would recognize a "special relationship" between players and the officials in charge of refereeing a game.

negligent supervision, such as allowing a student with a known propensity towards violence to play or allowing a team to play when there is a total absence of management").

No such evidence has been presented here. On the undisputed facts, neither the university nor its coach had any reason to foresee that Folk would engage in violent behavior. He had never done so before, he had no history suggestive of potential violence on or off the basketball court,[7] and nothing in his conduct during the earlier part of the game provided any warning signal that Folk was on the verge of a violent outburst. Neither the university nor its coach had any duty to protect Kavanagh from a harm that they could not have reasonably foreseen.

Kavanagh's final theory of negligence alleges that Folk's attack was incited by Coach Wolff's own aggressive demeanor on the sidelines.[8] Kavanagh has no evidence that Wolff instructed or expressly encouraged Folk to hit an opposing player. Rather, he contends that Wolff's animated style of coaching effectively pushed Folk beyond the boundaries of aggressive physical play into criminal violence. We agree with the motion judge that the record fails to support Kavanagh's theory.[9]

We must first address what standard is to be applied to claims that coaches are liable for causing their players to injure other players. Recognizing that, by their nature, competitive sports involve physical contact between opposing players, and that some degree of aggressiveness in play is essential to athletic

___

[7]While Kavanagh makes much of the fact that Folk had previously been suspended from the team, and had been disciplined by university authorities, none of those prior incidents had anything to do with violence or threats of violence.

[8]On appeal, Kavanagh does not press his claim against Wolff for intentional infliction of emotional distress.

[9]Kavanagh contends that the videotape of the game would show both the extremely aggressive play of the university team and Coach Wolff's conduct inciting that allegedly inappropriate aggression. However, Kavanagh did not submit the videotape as part of his opposition to the defendants' motion for summary judgment, and it is therefore not part of the record on appeal. See *Currens* v. *Assessors of Boston*, 370 Mass. 249, 254 (1976); *McIsaac* v. *Cedergren*, 54 Mass. App. Ct. 607, 609 n.3 (2002). The record before us contains only Kavanagh's description of the game and of Wolff's behavior during the game. We therefore rely entirely on Kavanagh's description.

competition, we have held that mere negligence on the part of a player does not suffice to impose liability for injuries inflicted by that player during competition. See *Gauvin* v. *Clark*, 404 Mass. 450, 454 (1989). Rather, an injured player must show that the other player's conduct amounted to recklessness before the law will impose liability. See *id.* Utilizing a standard of recklessness, as opposed to mere negligence, "furthers the policy that '[v]igorous and active participation in sporting events should not be chilled by the threat of litigation.' " *Id.*, quoting *Kabella* v. *Bouschelle*, 100 N.M. 461, 465 (1983). See *Gray* v. *Giroux*, 49 Mass. App. Ct. 436, 438-439 (2000) (same policy reasons justify imposing standard of recklessness even in non-contact sports). Just as players are entitled to play aggressively without fear of liability, a coach properly may encourage players to play aggressively. Indeed, a coach's ability to inspire players to compete aggressively is one of a coach's important attributes. The mere possibility that some players might over-react to such inspiration or encouragement should not, by itself, suffice to impose liability on a coach. As we do with the players themselves, we must impose liability only where a coach's behavior amounts to at least recklessness.[10] See *Kline* v. *OID Assocs., Inc.*, 80 Ohio App. 3d 393, 395-396 (1992) (standard of recklessness applicable to players should also apply to "nonparticipants involved in the game").

Here, Kavanagh cannot demonstrate any recklessness on the part of Coach Wolff. To the extent that Wolff's demeanor was excited and aggressive, that is demeanor appropriate for a coach during a game. As to Kavanagh's contention that Wolff encouraged violence by failing to send in substitute players for players who were allegedly committing fouls, that contention would effectively require Wolff to be more sensitive to possible fouls than the referees. Under the rules of any sport, fouls or other violations carry their own penalties, and it is up to the officials

---

[10]At least one court has held that a player injured by an opponent's violence does not state a claim against the opposing coach unless the coach taught or instructed the offending player to commit the attack. See *Nydegger* v. *Don Bosco Preparatory High Sch.*, 202 N.J. Super. 535, 539 (1985). Because the facts of the present case do not support even a claim of recklessness, we need not decide whether liability should be imposed only in cases involving a coach's express direction to assault or injure an opponent.

refereeing the competition to enforce those rules and impose those penalties. See note 6, *supra.* It is not up to a coach to remove a player who may, conformably with the rules of the sport and the judgment of the referees, remain in the game despite the infractions allegedly committed. Finally, Kavanagh contends that Wolff yelled encouragement to aggressive players, praising their play when those same players were, in Kavanagh's judgment, committing fouls. Again, the policing of fouls is up to the referees, and the mere fact that a player has committed a foul, or even multiple fouls, does not preclude a coach from encouraging that player to play aggressively. Coach Wolff's behavior, viewed in the light most favorable to the plaintiff, amounted to nothing more than aggressive coaching. It did not amount to reckless conduct.

*Judgments affirmed.*