Giles, J.
Introduction
Plaintiff Robert F. Brun (“plaintiff’), as administrator of the estate of Sandra Berfield (“Berfield”), instituted this wrongful death action against defendants Steven Caruso (“Caruso”),[1] Northeast Restaurant Corporation (“Northeast”), and Bickford’s Family Restaurants, Inc. (“Bickford’s”), arising out of Caruso’s murder of Berfield, the plaintiffs decedent. The complaint alleges negligence claims against Northeast and Bickford’s under the rubric “Failure to Provide a Secure Workplace.”
Northeast and Bickford’s now move for summary judgment against the plaintiff, which motions the plaintiff opposes.[2] After hearing, and for the reasons set forth below,'Northeast’s motion is DENIED; and Bickford’s motion is ALLOWED.
Background
This case emanates from Caruso’s stalking of Berfield over several years, culminating in his murder of her in 2000. From 1988 until her death, Berfield was employed by Northeast as a server at a restaurant in Medford, Massachusetts, known commonly as “Bickford’s” (“Restaurant”).[3] The Restaurant was owned and operated by Northeast pursuant to a licensing agreement with defendant Bickford’s parent company, ELXSI, a California corporation. The agreement allowed Northeast to use certain Bickford’s trademarks. Northeast, not Bickford’s, operated the day-to-day activities of the Restaurant. Caruso was a regular patron of the Restaurant who had been visiting the establishment on a daily basis for approximately ten years, often coming in two or three times a day. Additionally, between early 1996 and October 8, 1998, he regularly was hired by Northeast as a “handyman” to perform repair and maintenance jobs at the Restaurant.
Prior to stalking and murdering Berfield, Caruso harassed other Restaurant servers despite their repeated complaints to Northeast’s management. For example, starting in 1995 and continuing for almost a year, he began requesting the services of waitress Nellie Harrington (“Harrington”) and would sit only in her station. It was not uncommon for him to wait over an hour to sit in Harrington’s section even though there were other servers available. On one occasion, the hostess informed him that, because Harrington was too busy to wait on him, another waitress would take his order. He flew into a rage, threw his menus, and stormed out of the Restaurant.
Beginning in 1997, Caruso turned his unwanted attention towards Berfield by expressing a preference for being seated in her waitress section and sitting only there. On August 22, 1998, he showed up at the Restaurant while Berfield was working and washed her car in the parking lot without her permission. After *470 doing so, he asked Berfleld to go to the movies with him. When she declined his invitation, his behavior turned hostile. Berfleld and other employees noticed that Caruso would stare menacingly at her for long periods of time. Soon after, Berfleld told the Restaurant’s manager, Alexander Dellagrotta (“Dellagrotta”), that she did not want to wait on Caruso anymore because his staring was scaring her and making her uncomfortable.
On August 24, 1998, Caruso arrived unannounced and uninvited at the home of Pamela Berfleld (“Pamela”), Berfield’s sister, while Berfleld was there alone. When he knocked on the door, Berfleld refused to open it. On or about August 25, 1998, he entered the Restaurant and asked to speak with Berfleld, stating, “Her car isn’t here,” and then proceeded to the parking lot to look for her vehicle. During this visit,. Caruso seated himself in Berfield’s section. Soon thereafter, Dellagrotta told him that Berfleld was no longer allowed to serve him and that he was not allowed to sit in her section.
In September of 1998, State Police Trooper Sean Sullivan (“Tpr. Sullivan”), a customer of the Restaurant, spoke with Caruso while they were both on the premises and told him to leave Berfleld alone. Shortly after the conversation with the trooper, Caruso contacted Dellagrotta and threatened to file a lawsuit against the Restaurant. He claimed that Dellagrotta and the Restaurant discriminated against him when they told him that he could not sit in Berfield’s section. Additionally, he asked Dellagrotta to arrange a meeting between himself and Berfleld at a place other than the Restaurant. He also called Gerard Robertson (“Robertson”), the then vice president of operations for Northeast, and claimed that Tpr. Sullivan’s discussion with him constituted an assault. He requested to meet with Robertson to discuss his “problem” with Berfleld. During the meeting, Caruso told Robertson, “I want her terminated.” Furthermore, he suggested to Robertson that Berfleld was mentally unstable and even offered to pay for any psychiatric help that Berfleld may require. As a result of the meeting, Robertson repeated to Caruso Dellagrotta’s instruction that Berfleld was no longer allowed to serve him and that he was not allowed to sit in her station.
From then on, Caruso sat in a different server section but still sat in the same room in which Berfleld was working.[4] While in Berfleld’s room, Caruso would stare continuously at her with an angry expression on his face. She complained to Robertson about the scowling and, as a result, Dellagrotta prohibited Caruso from sitting in the same room in which Berfleld was working. As late as October 3, 1998, Dellagrotta reminded Caruso that he was not allowed to sit in Berfield’s section and that he was not to stare at her.
On September 18, 1998, Pamela told Caruso that Berfleld was attempting to get a restraining order against him. Two days later, on September 20, 1998, Berfield’s tires were slashed. On September 29, 1998, Berfleld heard a “popping noise” outside her apartment in Everett, Massachusetts, ran to the window, and saw Caruso standing by her car. Her tires again had been slashed. In response to this incident, she set up a video camera at her apartment on September 30, 1998, in an attempt to identify the individual responsible for the vandalism of her car. During the night of October 3, 1998, Berfield’s video surveillance camera recorded the image of a white male wearing a black, hooded sweatshirt pouring something into her automobile’s gas tank. The next morning, she discovered that battery acid had been poured into her car’s fuel tank, rendering the vehicle inoperable.
On October 5, 1998, Berfleld petitioned the Middle-sex County Superior Court for a restraining order against Caruso due to his repeated stalking behavior. On October 8, 1998, the court issued a restraining order requiring Caruso to have no contact with Berfleld and to stay at least 100 yards away from her and not to damage her car. After this restraining order was entered, Caruso never entered the Restaurant but did drive by it several times.
On October 25, 1998, Berfleld saw Caruso pouring battery acid into her gas tank despite the restraining order. Her car again was disabled. Thereafter, on November 5, 1998, the Middlesex County Superior Court issued an amended order stating that Caruso must stay out of the Restaurant and 500 yards away from Berfield’s apartment. On November 26, 1998, Caruso was arrested and charged with three counts of malicious destruction of Berfield’s property. He was held without bail until January 8, 1999.
On March 30, 1999, Caruso drove back and forth in front of the Restaurant while Berfleld was working there, thereby violating the restraining order. On April 23,1999 his bail was revoked, and he was taken into custody to await trial on the malicious destruction of property charges. On May 13, 1999, Caruso was convicted of two counts of malicious destruction of property and sentenced to eighteen months in the house of correction. He was released on July 29, 1999. On December 25, 1999, he entered the Restaurant and cut the gas lines, allowing gas to fill the closed premises.
On January 20, 2000, Caruso left a package bomb outside of Berfield’s apartment in Everett. A downstairs neighbor who saw the box believed that the return address included the town of Malden and the name “Passinissi,” which is the surname of one of Berfield’s sisters.[5] Berfleld was killed instantly by the explosion when she opened the package bomb. Caruso was arrested and prosecuted for her murder. On August 15, 2003, he was convicted of first-degree murder.
Discussion
I. Summary Judgment Standard
Summary judgment is properly granted where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *471 Mass.R.Civ.P. 56(c); Nashua Corp. v. First State Ins. Co., 420 Mass. 196, 202 (1995); Cassesso v. Comm’r of Corr., 390 Mass 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of demonstrating affirmatively the absence of a triable issue and entitlement to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). This burden maybe met by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass, 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the pariy opposing the motion must respond and allege facts which would establish the existence of a genuine issue of material fact in order to defeat [the motion].” Pederson, 404 Mass. 17. Furthermore, in determining whether a genuine issue of material fact exists, the court must draw all inferences from the underlying facts in the light most favorable to the parly opposing the motion. Attorney General v. Bailey, 386 Mass. 367, 371 (1982).
II. Northeast
The plaintiff alleges that Northeast had a legal duty to protect Berfield from Caruso’s violent actions because they were reasonably foreseeable. Northeast counters that it had no duly to protect Berfield from the criminal acts of a third party in these circumstances, especially in view of the passage of time between Caruso’s last permissive entry into the Restaurant and Berfield’s murder off the premises.
“[A]s a general rule, there is no duty to protect another from the criminal acts of a third party.” Kavanaugh v. Trustees of Boston University, 440 Mass. 195, 201 (2003). A duty may arise, however, where there is a “special relationship” between the defendant and the injured victim. Id. See Mullins v. Pine Manor College, 389 Mass. 47, 51-52 (1983); Restatement (Second) of Torts, §314(A) (1965); Restatement (Second) of Agency, §512(1) (1958). “A special relationship is based on the plaintiffs reasonable expectations and reliance that a defendant will anticipate harmful acts of a third person and take appropriate measures to protect the plaintiff from harm.” Kavanaugh 440 Mass, at 201.
Accordingly, an employer may have a legal obligation to protect its employees from workplace threats and troubles. See Foley v. Boston Housing Authority, 407 Mass. 640, 644 (1990). A line of cases from other jurisdictions has held that, in certain circumstances, the employer-employee relationship may give rise to a duty to protect the employee from the criminal acts of a third pariy. Id. at 644, n.5; Irwin v. Ware, 392 Mass. 745, 760-62 (1984). See, e.g., Lillie v. Thompson, 332 U.S. 459, 462 (1947); Wanca v. Penn Industries, 260 F.2d 350 (2nd Cir. 1958); Morgan v. Bucks Assocs., 428 F.Sup. 546 (E.D.Pa. 1977); Circle K Corp. v. Rosenthal 574 P.2d 856, 861 (Ct.App. 1977); Ozment v. Lance, 437 N.E.2d 930, 934-35 (1982); Thoni Oil Magic Benzol Gas Stations, Inc. v. Johnson, 488 S.W.2d 355 (Ky. 1972); Yunker v. Honeywell Inc., 496 N.W.2d 419 (1993); Bartlett v. Hantover, 9 Wn.App. 614, 513 P.2d 344 (1973).
In the case at bar, evidence in the record creates a genuine issue of material fact as to whether Northeast and Berfield had a “special relationship” which was predicated on Berfield’s reasonable expectations that Northeast would anticipate Caruso’s predatory ways and take appropriate measures to protect her. Northeast owed a duty to its employees to provide a safe place to work, which included a duty to take reasonable precautions against exposing them to potentially dangerous individuals. See Yunker, 496 N.W. at 422. Berfield was employed to have direct contact with the public, and Caruso, in addition to being a regular patron, frequently was hired by Northeast as a handyman, with access to all parts of the Restaurant. Thus, Northeast had an interest in keeping a troublesome, menacing employee and customer, such as Caruso, off the premises.
Furthermore, there is a clear issue as to whether the danger in Berfield’s continued exposure to Caruso was reasonably foreseeable to Northeast. Caruso patronized the Restaurant for over a decade with unusual regularity and frequency. Northeast was on notice that he had harassed other waitresses before Berfield. It also was aware of his bizarre accusations and increasingly hostile, malicious behavior towards her, both on and off the premises. Then, on December 25, 1999, less than a month before Berfield’s death, Caruso entered the Restaurant and cut the gas lines. Sadly, it is all too often within the range of human experience that obsessive behavior escalates into harassment and then into stalking, or worse. Therefore, in view of Northeast’s knowledge of Caruso’s campaign of vandalism and threatening behavior toward Berfield, an argument can be made that the danger he posed to Berfield was reasonably foreseeable. See Copithorne v. Framingham Union Hospital 401 Mass. 860, 865 (1988).
Finally, there exists a true factual dispute as to whether Northeast breached its duty to Berfield in failing to protect her from the harm of Caruso’s stalking, which culminated in her murder on January 20, 2000. Despite his obvious fixation upon Harrington and his alarming outburst when she could not serve him, Northeast did nothing to exclude Caruso as far back as 1995 and, indeed, even chose to hire him as a handyman, with unregulated access to the Restaurant. Despite Northeast’s awareness of Caruso’s escalating violence, it did nothing to keep him off the premises until the court interceded on October 8, 1998.
In this unusual case, a factfinder could determine that Northeast’s inaction prior to October 8, 1998, *472 increased the risk of harm to Berfield by exposing her to daily, direct contact with Caruso, who presented as a serial harasser. The plaintiff could argue that Northeast’s failure to act tacitly encouraged and empowered Caruso to develop his obsessive attachment to Berfield, which led inexorably to her murder in January 2000. While it is true, as Northeast asserts, that Caruso did not enter the Restaurant permissibly during the fifteen months prior to Berfield’s murder, it is for the factfinder to determine whether that lapse of time, during six months of which he was incarcerated, broke the chain of causation. See Solimene v. Grauel & Co., K.G., 399 Mass. 790, 802 (1987). In addition, the fact that Berfield suffered a different kind of harm (murder) than that which was threatened by Northeast’s negligence (stalking) does not relieve Northeast from liability. See Restatement (Second) of Torts, §281, Comment j (1965); Prosser on Torts, §43, at 259 (4th ed. 1971). For all these reasons, summary judgment for Northeast is not warranted.[6]
III. Bickford’s
It is uncontroverted that neither Berfield nor Caruso were employees of Bickford’s, and the plaintiff makes no claim of a special relationship between Berfield and Bickford’s or any awareness on Bickford’s part of any problems between Berfield and Caruso. Instead, the plaintiff contends that, nevertheless, Bickford’s should be held vicariously liable for the alleged negligence of Northeast on account of the defendants’ “License Agreement” (“Agreement”). The court disagrees.
Generally, a licensor cannot be held liable for the wrongful acts of the licensee absent extraordinary circumstances which give rise to an agency relationship. Sherman v. Texas Co., 340 Mass. 606, 607-08 (1960). See also McLaughlin v. McDonald’s Corp. et al., Civil Action No. 98-40240-NG (2001) (Swartwood, J.) (interpreting Massachusetts law and finding that franchisor was not liable for franchisee’s negligence because franchisor did not exercise sufficient control over franchisee as it did not participate in management of franchisee’s business); Wendy Hong Wu v. Dunkin Donuts, Inc., 105 F.Sup.2d 83, 87 (E.D.N.Y. 2000) (whether franchisor should be held vicariously liable for negligent conduct of its franchisee depends on whether “the franchisor controls the day-to-day operations of the franchisee, and more specifically whether the franchisor exercises a considerable degree of control over the instrumentality at issue in a given case”); Burgos-Oquendo v. Caribbean Gulf Refining Corp., 741 F.Sup. 330 (D.P.R. 1990); Pizza K, Inc. v. Santagata, 547 S.E.2d 405 (Ga.App. 2001); Risner v. McDonald’s Corp., 18 S.W.3d 903, 906 (Ct.App.Tex. 2000); Oberlin v. Marlin Am. Corp., 596 F.2d 1322 (7th Cir. 1979); Murphy v. Holiday Inns, Inc., 216 Va. 490 (Va. 1975); Arnsonv. General Motors Corp., 377 F.Sup. 209 (N.D. Ohio 1974). No such extraordinary circumstances are present here.
In the instant action, there is no evidence that Bickford’s managed the Restaurant or exerted “pervasive control" over its day-to-day operations or employees. McLaughlin, Civil Action No. 98-40240-NMG. Rather, Bickford’s merely licensed its trademarks to Northeast pursuant to the Agreement. Specifically, that contract entitled Northeast to use Bickford’s mark and name in the operation of the Restaurant in return for agreeing to adhere to Bickford’s system, including matters such as building design and layout, menus, recipes, food preparation, and food and beverage specification. Additionally, Northeast agreed to indemnify and hold Bickford’s harmless from all liability, damage, loss, and expense of whatever nature arising from the operation of the Restaurant. No agency relationship was implied in the Agreement.
There is nothing in the record to support the plaintiffs claim that Bickford’s exerted proprietary control over the operation of its licensee, Northeast. Bickford’s did not control the day-to-day activities, hiring or firing, or personnel decisions at the Restaurant; and it assumed no responsibility for any of the Restaurant’s operational costs. Its involvement with the Restaurant was limited to providing some off-site accounting functions and issuing a product manual designed to maintain food quality and consistency.[7] Thus, Bickford’s did not exercise supervisory control over the Restaurant’s operations sufficient to impute Northeast’s negligence to it. As such, Bickford’s is entitled to summary judgment.
ORDER
For all the foregoing reasons, it is hereby ORDERED that Northeast’s motion for summary judgment be DENIED and that Bickford’s motion for summary judgment be ALLOWED.

 Caruso failed to plead or otherwise defend in this matter and, therefore, was defaulted pursuant to Mass.R.Civ.P. 55(a).

Given the depth and breadth of the factual material before the court, additional time in which to await the criminal trial transcript and to engage in discovery, as requested by the plaintiff as against Northeast, would appear unnecessary. See Godbout v. Cousens, 396 Mass. 254, 262 n.11 (1979). Moreover, the plaintiff has chosen not to take any depositions since the complaint was filed in January 2003, almost two years ago.

The location is now a Krispy Kreme doughnut shop.

The Restaurant is divided into three rooms, with approximately three server stations per room.

There is no support in the record for plaintiffs claim that Caruso may have obtained that name and address from Berfield’s personnel file in Northeast’s office.

Having so decided, this court need not reach the plaintiffs second theory of liability, that is, that Northeast voluntarily assumed and then breached a duty to protect Berfield. See Davis v. Westwood Group, 420 Mass. 739, 746 (1995); Mullins, 389 Mass, at 52.

By the plaintiffs own admission, Bickford’s policy manual, “Rules for Managing Problem Guests,” was not in effect at the relevant times.