SUPERIOR COURT 
 
 MORGAN ROE Plaintiff v. NORTHEASTERN UNIVERSITY, KATHERINE ANTONUCCI, ROBERT JOSE, BRIANA R. SEVIGNY, MARY WEGMANN & MADELEINE ESTABROOK Defendants

 
 Docket:
 16-03335-C
 
 
 Dates:
 March 8, 2019
 
 
 Present:
 Robert B. Gordon 
 
 
 County:
 SUFFOLK, ss
 

 
 Keywords:
 .
 
 

 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS’ MOTION FOR SUMMARY JUDGMENT

 Plaintiff Morgan Roe (the "Plaintiff")[1] alleges that, while she was a student at Northeastern University ("NU" or the "University"), she was sexually assaulted by another student in that student’s dormitory room. Plaintiff brings against action against NU and several of its employees, Katherine Antonucci, Robert Jose, Briana R. Sevigny, Mary Wegmann, and Madeleine Estabrook (collectively, the "Defendants"), alleging that they failed to protect her against the assault and inadequately handled her ensuing complaint. Plaintiff asserts claims for negligence, negligent infliction of emotional distress, and violation of the Massachusetts Equal Rights Act (the "MERA") against all Defendants, as well as claims for breach of contract and violation of Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681 et seq. ("Title IX") against NU.[2] Presented for decision is the Defendants’ Motion for Summary Judgment. Following a hearing and for the reasons which follow, the Defendants’ motion shall be ALLOWED.

FACTUAL BACKGROUND
 The following facts are taken from the summary judgment record and the statement of undisputed material facts filed jointly by the parties under Superior Court Rule 9A(b)(5). The Court reserves further recitation of the facts for its discussion below.

I. The Parties

 NU is a non-profit, charitable corporation that offers undergraduate and graduate education degrees. Plaintiff was a student at NU from the fall of 2013 until she graduated in December, 2017. 
 NU operates a Department of Residential Life (the "Department"), which employs and trains staff to supervise campus residential life. During the relevant time period, Defendant Jose was NU’s Associate Dean of Cultural, Residential and Spiritual Life, and the Director of NU’s Residence Life Office. Jose was tasked with general oversight of the Department, including the hiring, training and overseeing its staff, and with ensuring that NU campus policies were enforced. Jose had supervisory authority over Defendant Antonucci, who served as an Area Coordinator at NU. Antonucci was responsible for training and directly overseeing the work of certain resident assistants ("RAs").
NU operates a Student Conduct and Conflict Resolution ("OSCCR") program, which administers disciplinary proceedings against students alleged to have violated the University’s Code of Student Conduct (the "Code"). Defendant Estabrook was NU’s Associate Vice President for Student Affairs, and oversaw OSCCR. Defendant Wegmann was NU’s Director of OSCCR, and was charged with enforcing the Code and other University policies, as well as supervising, hiring and training Student Conduct Board and Appeals Board members. Defendant Sevigny was NU’s Assistant Director of OSCCR, and provided training to both Residential Life staff and members of the Student Conduct Board. 

II. Relevant NU Policies
A. The Code

 At all relevant times, the Code prohibited underage students from drinking or possessing alcohol on campus, including in residence halls, and prohibited all students from furnishing alcohol to underage students. Underage students were prohibited from even being in the presence of alcohol, unless such alcohol was in the possession of a roommate who was age 21 or older. The Code further prohibited excessive alcohol consumption and sexual assault. Students who violated the Code could be subject to discipline by NU.

 B. NU’s Security and Supervision of Residence Halls

 NU engages certain students as RAs to serve as role models for the University’s undergraduate community. RAs are "paraprofessional" members of NU’s Residence Life Office. They are required to sign a "Resident Assistant Agreement," and receive financial compensation in the form of on-campus housing in exchange for their service. RAs are engaged, trained and supervised by NU staff. 
 NU requires its RAs to be familiar with the Code, to perform periodic rounds in their assigned buildings, to serve as resident hall proctors, to intervene if students violate community norms, to remain sober and drug-free while on duty, and to maintain high standards of personal conduct and integrity. RAs also are required to take corrective action and report any violation of the Code to their supervisors, even if the violation occurs when the RA is "off duty" or in a building to which the RA is not ordinarily assigned. The failure of an RA to intercede when students under 21 years old are drinking alcohol, to obtain assistance for students in need, and to report Code infractions are all violations of an RA’s duties under the Code. Such violations could serve as a basis to dismiss the RA from that role.

III. The Events of October 31, 2013

 In the fall of 2013, Plaintiff was a freshman at NU. NU required that all freshman students live on campus. Plaintiff lived in International Village, one of the University’s residence halls. Another freshman student ("the assailant"), who was Plaintiff’s classmate and part of her student study group, also lived in International Village.[3]
 On October 31, 2013, Plaintiff and the assailant were invited to attend a Halloween party hosted by a sophomore student, Stacey Anderson, in Anderson’s dorm room at 97 St. Stephen Street, a property leased by NU for student housing. Plaintiff, the assailant, Anderson, and Patrick Ward, another sophomore student attending the party, were classmates and had socialized on prior occasions. These four students, as well as all of the other attendees at the party, were under the age of 21.
 That evening, Plaintiff and the assailant consumed alcohol in Plaintiff’s dorm room, and then made their way to the party at around 9:00 p.m. Once at the party, Plaintiff and the assailant consumed rum and Coke that they had brought with them in a Coca Cola bottle; and the assailant additionally provided Plaintiff with Fireball whiskey that he obtained from another party-goer (not Anderson or Ward). Plaintiff also played drinking games with some or all of the party participants.
 Anderson was an RA on duty on the evening of the party. She left the party at times to attend to her rounds, but always returned to the room when she was finished. Ward was also an RA, but served in another dorm and was not on duty at the time of the party. 
 At some point during the evening, Plaintiff became very intoxicated and vomited several times in Anderson’s bathroom. Two female NU students who also were at the party stayed with Plaintiff in the bathroom to lend support to her. The two wanted to take Plaintiff back to her dorm room, but did not believe that the proctors who signed residents into the dormitory would allow Plaintiff to enter the building in her visibly intoxicated state, and might even seek to discipline them on account of Plaintiff’s condition. The assailant, who was also intoxicated, volunteered to take Plaintiff home, because they lived in the same dormitory and he needed to get up early for crew practice. 
 Despite their awareness that party attendees were under the age of 21, RAs Anderson and Ward observed many attendees drink alcohol to the point of intoxication, personally consumed alcohol themselves, and played drinking games with other party-goers. During the time that Plaintiff was at the party, neither Anderson nor Ward assisted Plaintiff by calling NU police to assess her condition, by offering her safe transport home (as was available pursuant to the University’s Medical Amnesty policy), or by volunteering to escort Plaintiff back to her dorm room. 
 Plaintiff and the assailant departed the party at around 11:20 p.m., and Plaintiff texted her roommate to let her know that she was on her way home. Plaintiff relied on the assailant for support as the two walked and, at one point, Plaintiff stumbled and fell, causing the assailant to fall himself. At some point during the walk, the assailant took the Plaintiff’s cell phone and identification from her. The two students also kissed during the course of the walk. When they arrived at their dormitory, Plaintiff leaned on the proctor’s desk as the proctor checked her and the assailant’s identification. Plaintiff was unsteady on her feet as she left the proctor’s desk and approached the elevators in the dorm. 
 The assailant then told Plaintiff that he needed to get something from his room, and invited Plaintiff to come with him while he retrieved the item. Plaintiff agreed, and accompanied the assailant to his room. Once inside the room, the assailant kissed Plaintiff, and the two eventually ended up undressed in the assailant’s bed. The assailant then initiated sexual relations with Plaintiff. Plaintiff said "ouch" several times, and further informed the assailant that she was a virgin. The assailant then told Plaintiff that he would get a condom. Plaintiff did not respond or say that she did not want to have sex, but recalls today that she was very uncomfortable at the time. The assailant also guided Plaintiff’s head down to his groin in an attempt to prompt her to perform oral sex on him, but told her she could stop when she said, "I have never done this before." At certain points during the encounter, Plaintiff rolled over and pulled the blanket up over her head; and, at least at one other point, Plaintiff vomited in the assailant’s bathroom. Plaintiff was afraid to leave the dorm room, because she thought that the assailant would not let her do so or that he might hurt her. Ultimately, the assailant and Plaintiff had oral, anal, and vaginal sex over the course of several hours. 
 When Plaintiff returned to her own dorm room the next morning, she cried and confided to her roommate what had occurred. The roommate asked whether Plaintiff would have stopped the encounter had she been sober, and Plaintiff replied that she would have. With Plaintiff’s consent, the roommate told their RA about the alleged sexual assault. Plaintiff also disclosed the sexual assault to her mother, who accompanied Plaintiff to the NU Police Department ("NUPD") to report the incident. NUPD then accompanied Plaintiff and her mother to the Emergency Room at Beth Israel Hospital for an assessment, and the hospital thereupon performed a rape kit. 

IV. NU’s Response to Plaintiff’s Report
A. Interim Measures Offered to Plaintiff

 NU extended Plaintiff certain interim protective measures following her report of this incident. Specifically, the University issued a "no contact" order which precluded the assailant and Plaintiff from directly or indirectly communicating with one other. The assailant fully adhered to the no contact order. NU additionally offered Plaintiff the option to transfer out of the lone class that she was then taking with the assailant and to move out of International Village, but Plaintiff declined. Plaintiff requested instead that NU transfer the assailant out of her class and dormitory. The University declined to do so, however, because the assailant had not been found responsible for any policy violation, and because the University had not yet determined whether failing to take such actions would create a hostile environment for the Plaintiff. 

B. NUPD’s Investigation and Report 
 NUPD promptly investigated Plaintiff’s report by collecting evidence, reviewing surveillance footage, and interviewing Plaintiff, the assailant, and Plaintiff’s roommate. The NUPD then generated a report (the "NUPD Report") that identified other party attendees, including Anderson and Ward. NUPD did not, however, interview any of these other party attendees. One of the two female students who stayed in the bathroom with Plaintiff when she was sick at the party provided an account to NUPD on her own initiative, but NUPD did not document her statement.

C. Anderson and Ward

 The NUPD Report was furnished to Defendant Wegmann, the OSCCR Director, who shared it with Defendant Sevigny, the OSCCR Assistant Director, and Defendant Estabrook, the Associate Vice President of Student Affairs. Although the Report revealed that Anderson and Ward had consumed alcohol with NU students who were under 21 years of age, Wegmann, Sevigny and Estabrook did not discipline Anderson or Ward for their violations of the Code and their agreement as RAs; nor did they inform the University staff responsible for their supervision, including Defendants Antonucci or Jose, of these violations. Ultimately, Anderson and Ward were never investigated, disciplined or sanctioned for their conduct on October 31, 2013.
 After learning of Plaintiff’s report, Ward told his supervisor, a Residence Hall Director ("RD"), that minor students (including Plaintiff and the assailant) had consumed alcohol at a party at a student’s residence on the night that Plaintiff reported being sexually assaulted by the assailant. The RD did not convey this information to his supervisors, including Defendants Antonucci or Jose.

D. Disciplinary Proceedings

 Based on the NUPD Report, OSCCR charged the assailant with a Code violation of "sexual assault with penetration." Disciplinary proceedings were conducted before a Student Conduct Board (the "Board") comprised of five students who operated under the supervision of an OSCCR staff member. In this instance, Brooke Tempesta ("Tempesta"), an Assistant Director of Student Conduct, assembled the five-person Board and oversaw its hearings into the charge brought against the assailant. Tempesta’s role was to ensure that the hearing procedures outlined in the Code were followed, and to answer any procedural questions that arose.
 In order to become a Board member, NU students first needed to meet eligibility requirements and to be interviewed by OSCCR staff. Selected Board members were further required to complete a four-hour training module conducted by OSCCR, the Office of the General Counsel, and other campus partners, and to observe one full OSCCR proceeding. In order to serve on a sexual assault case, Board members were additionally required to complete a three- to four-hour specialized training in which Defendants Wegmann and Sevigny assisted. This training focused on sexual misconduct charges, the definitions of consent and incapacitation, and the implications of drug and alcohol consumption in matters of sexual assault. 
 At the time of the decision, the Code provided:

CONSENT: Appropriate sexual behavior requires consent from all parties involved. Consent means a voluntary agreement to engage in sexual activity proposed by another and requires mutually understandable and communicated words and/or actions demonstrating agreement by both parties to participate in all sexual activities.
Consent may never be given by ... those who are incapacitated as a result of alcohol or other drug consumption (voluntary or involuntary).... A person who knows or should reasonably have known that another person is incapacitated may not engage in sexual activity with that person. Incapacitation is a state where one cannot make a rational, reasonable decision because they lack the ability to understand the who, what, when, where, why or how of their sexual activities.
(J.A., Ex. 8 at 20.).
 On November 21, 2013, the matter proceeded to a disciplinary hearing before the Board. Plaintiff and the assailant both had hearing advisors present to assist them during this proceeding. The Board heard opening and closing statements from NUPD Officer Adam Keeling, the Plaintiff, and the assailant. The Board then asked questions of each individual and, per Plaintiff’s request, the questions were posed through the Board Chair.
 After the hearing, the Board deliberated and determined by a vote of 4-1 that the assailant was not responsible for the Code violation of sexual assault with penetration. The following day, November 22, 2013, Tempesta issued a letter to the assailant, informing him of the Board’s decision. Plaintiff also received notification of this decision; but, in accordance with NU’s policy at the time (and to which she consented), Plaintiff was not provided with the rationale for the Board’s decision. In the notification letter transmitted to the assailant, Tempesta explained:

The Board determined that you and the complainant had consumed alcohol on the night of the incident and engaged in sexual activity. Throughout the hearing you relayed to the Board actions that occurred with the other party that you believed to have communicated consent. The Board considered your account along with the account provided by the complainant. The Board then considered whether a "reasonable person" would consider the words and/or actions expressed by the complainant during the incident to indicate consent to each sexual activity.
Due to the severity of the alleged violation, members of the Board spent a substantial amount of time reviewing all information presented. The Board considered Northeastern University’s Code of Student Conduct definition for Sexual Assault and consent. Upon review of the information as it relates to the charge of Sexual Assault with penetration, the Board could not come to a more likely than not determination that you are responsible for this violation. 
(J.A., Ex. 24 at 1.).[4]
 
 Plaintiff appealed the Board’s finding to the University’s Appeals Board. The Appeals Board was overseen by Defendant Wegmann, and consisted of one student, one administrator from Student Affairs, and one administrator from Academic Affairs. In preparing her request for appeal, Plaintiff was afforded the opportunity to review the audio recording of the Board hearing, but declined to do so. On December 4, 2013, Wegmann notified Plaintiff that the Appeals Board had determined that a procedural error occurred during the original hearing, but did not specify the nature of that error. As a result, the Appeals Board remanded the matter to be reheard de novo by a different Board. (See J.A., Ex. 28.)
 On January 8, 2014, Defendant Estabrook informed Plaintiff and the assailant that, in preparing for the rehearing, NU had determined that Plaintiff did not cite either the specific procedural error or the new evidence that was the basis for her appeal, and the assailant had likewise not been provided with a copy of Plaintiff’s request for appeal or afforded an opportunity to respond thereto. As a result of these "appellate error[s]," Estabrook provided Plaintiff an opportunity to amend her request for appeal to identify both the alleged procedural error and the new evidence upon which she sought to rely, and then afforded the assailant an opportunity to respond to same. Estabrook explained that the amended request and any response thereto would be considered anew by the Appeals Board. (See J.A., Ex. 29.). Plaintiff submitted an amended request, but was at this point unable to review the recording of the original Board hearing because it had been destroyed per standard NU procedure when the appeals period passed.
 On February 7, 2014, the Appeals Board rendered its decision on Plaintiff’s amended request for appeal. The Appeals Board first found that there had been no procedural error, because "[t]he procedures outlined in the Code of Student Conduct were followed during the hearing and pre-hearing process." (J.A., Ex. 30.). The Appeals Board next found that the results of the rape kit that Plaintiff had offered as one of the bases for her appeal constituted new evidence, and remanded the matter to the original Board to evaluate whether consideration of that information would alter its previous findings. (See id.). 
 On February 25, 2014, Tempesta notified Plaintiff that the Board had determined its original decision should stand. Tempesta explained that the Board’s perspective did not change in light of the new evidence, because "[t]he Board determined that during the original hearing both parties stated that various sexual activities had taken place over a period of time, and that semen would be likely to be present in rape kit results." (J.A., Ex. 53.).
 Following disposition of the assailant’s disciplinary hearing, Plaintiff remained a full-time student at NU and continued her education program at the University without interruption. Plaintiff had no further interactions with the assailant, and experienced no harassment or mistreatment of any kind.[5]
DISCUSSION

 In this lawsuit, Plaintiff alleges that the Defendants were negligent, negligently inflicted emotional distress upon her, and violated the MERA. Plaintiff additionally claims that NU breached its contract with Plaintiff as its student, and violated Title IX. For the reasons which follow, the Defendants are entitled to summary judgment on all claims. 

I. Legal Standard

 "Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Godfrey v. Globe Newspaper Co., Inc., 457 Mass. 113, 118-19 (2010). In determining whether the moving party is entitled to judgment as a matter of law, the evidence is viewed in the light most favorable to the non-moving party. Harrison v. NetCentric Corp., 433 Mass. 465, 468 (2001). "Where the party opposing the motion bears the burden of proof at trial, the moving party will prevail only if it demonstrates that the nonmoving party has no reasonable expectation of proving an essential element of the case." Cabot Corp. v. AVX Corp., 448 Mass. 629, 637 (2007) (citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991)). "A complete failure of proof concerning an essential element of the non-moving party’s case renders all other facts immaterial." Kourouvacilis, 410 Mass. at 711. "Conclusory statements, general denials, and factual allegations not based on personal knowledge are insufficient to avoid summary judgment." Madsen v. Erwin, 395 Mass. 715, 721 (1985) (internal modifications and quotations omitted). 

II. Merits of Plaintiff’s Claims

 A. Negligence Against NU (Count I)
 Plaintiff alleges that NU was negligent in failing to protect her from a sexual assault perpetrated against her by another student. This negligence claim is premised on three distinct theories of institutional liability: (1) NU breached its duty to protect Plaintiff from the criminal acts of third parties; (2) NU is vicariously liable for the acts and omissions of its RAs on the evening of the sexual assault; and (3) NU was otherwise negligent in training and supervising its RAs. (See Pl.’s Mem. In Opp’n to Def.’s Mot. Summ. J., at 22-29.). NU counters that Plaintiff’s claim under each of these theories fails, because the University owed Plaintiff no legal duty to protect her from the sexual assault of a fellow student in the circumstances presented. 
 In order to prevail on a negligence claim, a plaintiff must show the existence of an act or omission in violation of a duty owed to her by the defendant. See Roe No. 1 v. Children’s Hosp. Med. Ctr., 469 Mass. 710, 713 (2014). If a duty exists, its scope is limited to protecting against only those harms that are reasonably foreseeable. See Kavanagh v. Trustees of Boston Univ., 440 Mass. 195, 203 (2003). "[T]he existence of a duty is a question of law, and is thus an appropriate subject of summary judgment." Jupin v. Kask, 447 Mass. 141, 146 (2006).

 1. NU’s Duty to Protect Students from Crimes
Committed by Other Students
 As a general rule, there is no duty to protect another from the criminal or wrongful acts of third parties. See, e.g., Jupin, 447 Mass. at 148; Kavanagh, 440 Mass. at 201. There are exceptions to this general rule, however, when there exists a special relationship between the defendant and the injured party that gives rise to a duty, see Kavanagh, 440 Mass. at 201, or when the defendant voluntarily assumes a duty to the victim, see Mullins v. Pine Manor College, 389 Mass. 47, 52 (1983). The general rule is likewise inapplicable when an actor realizes or reasonably should realize that his act or omission "involves an unreasonable risk of harm to another through the [criminal] conduct of ... a third person," viz., when the actor creates the situation by his own conduct that exposes another to a recognizably high degree of harm, including at the hands of a third party perpetrator of a crime. See Jupin, 447 Mass. at 148 (quoting Restatement (Second) of Torts § 302B). None of these circumstances exist here.

 a. Special Relationship

 Plaintiff first argues that a special relationship exists between her and NU, such that the University had a duty to protect her from the assailant’s criminal acts. Plaintiff rests this argument on the Supreme Judicial Court’s decisions in Mullins v. Pine Manor College, 389 Mass. 47 (1983), and Nguyen v. Massachusetts Institute of Technology, 479 Mass. 436 (2018). Plaintiff’s argument, however, depends for its viability on a reading of those cases that is far too expansive to withstand scrutiny. 
 In Mullins, the SJC recognized that a college has a duty to implement adequate security measures, including the provision of door locks and security guards, to protect its students in on-campus housing from the criminal acts of third party intruders. The SJC found the existence of this duty under two tort principles. First, the SJC located a source of the duty in "existing social values and customs," in light of evidence that there was a consensus among colleges that it was their responsibility, and not that of resident students who live in their dorms for a relatively short period of time, to provide an adequate level of security on campus. See Mullins, 389 Mass. at 51-52. Second, the SJC found that the college defendant had voluntarily assumed a duty to provide adequate security on its campus by posting guards, erecting a fence, and furnishing locks on the residential buildings. Having thus voluntarily assumed a duty to furnish students with security, therefore, the university was required to carry out that duty with due care. See id. at 52-54. 
 In Nguyen, a case involving a graduate student who committed suicide on his university’s campus, the SJC expressly recognized that a school might have a "special relationship" with its students that could give rise to a duty to rescue. See Nguyen, 479 Mass. at 449-50 (citing Restatement (Third) of Torts: Liability for Physical and Emotional Harm §§ 40(a) and (b)(5)). The SJC cautioned, however, that the potential existence of a special relationship between a student and university was "the beginning and not the end of the analysis," Nguyen, 479 Mass. at 450, because such analysis involves "a complex mix of competing considerations," id. at 452. The SJC then went on to consider the nature of the university-adult student relationship, explaining that, since Mullins, "[t]here is universal recognition that the age of in loco parentis has passed, and that the [university’s] duty, if any, is not one of a general duty of care to all students in all aspects of their collegiate life." Id. at 451 (quoting Massie, "Suicide on Campus: The Appropriate Legal Responsibility of College Personnel," 91 Marq. L. Rev. 625, 640 (2008)) (citing Mullins, 389 Mass. at 52; Bradshaw v. Rawlings, 612 F.2d 135, 139 (3d Cir. 1979); Schieszler v. Ferrum Coll., 236 F. Supp. 2d 602, 610 (W.D. Va. 2002)). Ultimately, the SJC determined that a university has a special relationship with a student and a corresponding duty to take reasonable measures to prevent his suicide only if the university has either actual knowledge of the student’s previous suicide attempt (either while enrolled at the school or shortly before the student’s matriculation) or of the student’s declared plan or intent to commit suicide. See Nguyen, 479 Mass. at 453.[6] The SJC explained, however, that the duty was "definitely not a generalized duty to prevent suicide," and emphasized the "limited circumstances creating the duty ...[that] hinge[] on foreseeability." Id. at 455 (emphasis added).
It is clear from Mullins and Nguyen, therefore, that, in limited circumstances, a special relationship does exist between a university and its adult students, such that the university owes its students a duty of reasonable care with regard to risks that arise within the scope of their relationship. See id. at 449-50. Indeed, as NU rightly acknowledges in this case, the University has an affirmative duty to prevent harm to students resulting from sexual assault either when it has actual knowledge that a particular person presents a foreseeable risk of committing an assault, or, like in Mullins, when the University has itself placed the student in harm’s way and then thereafter fails to mitigate the risk of harm when it is in a position to do so. (See Defs.’ Mot. for Summ. J. at 17-19.). None of those narrow circumstances that would give rise to a special duty of care are present in the case at bar. 
 In the present action, Plaintiff voluntarily consumed alcohol in her dorm room and then again at a party hosted by an on-duty RA in that RA’s room. After she became intoxicated and was escorted by the assailant back to the dormitory where they both lived, the assailant sexually assaulted Plaintiff in his dorm room. As NU argues, and the Court agrees, universities do not occupy a special relationship with their adult students such that they have a legal duty to protect such students (like Plaintiff) from harms that follow or result from underage drinking. This is so, regardless of whether the drinking itself is illegal or otherwise prohibited by University policy. See Doe v. Emerson Coll., 153 F. Supp. 3d 506, 514 (D. Mass. 2015) ("Massachusetts does not impose a legal duty on colleges or administrators to supervise the social activities of adult students, even though the college may have its own policies prohibiting alcohol or drug abuse."); Doe v. Northeastern Univ., No. MICV15-04200, slip op. at 9 (Mass. Super. Ct. Sept. 18, 2018) (Sullivan, J.) (university has no duty to protect students from harms associated with the consumption of drugs or alcohol as a matter of law); Bash v. Clark Univ., 22 Mass. L. Rptr. 84, 2006 WL 4114297, at *4 (Mass. Super. Ct. Nov. 20, 2006) (Agnes, J.) (university does not have a duty to protect students from the voluntary use of drugs and alcohol). Indeed, courts have widely recognized that imposing such a duty on universities would be both "impractical and unrealistic." Doe v. Emerson Coll., 153 F. Supp. 3d at 514. See Bash, No. 06745A, 2006 WL 4114297, at *5 (quoting Crow v. California, 222 Cal. App. 3d 192, 209 (1990)) ("[A] university cannot prevent [students’ voluntary consumption of drugs and alcohol] from occurring ‘except possibly by posting guards in each dorm room on a 24-hour, 365-day per year basis.’"); Beach v. University of Utah, 726 P.2d 413, 419 (Utah 1986) ("It would be unrealistic to impose upon an institution of higher education the additional role of custodian over its adult students and to charge it with responsibility for preventing students from illegally consuming alcohol and, should they do so, with responsibility for assuring their safety and the safety of others."). Nor does a university have a legal duty to educate its students regarding the potentially heightened risk of sexual assault due to drinking. See Doherty v. Emerson Coll., No. 1:14-CV-13281-LTS, 2017 WL 4364406, at *10 (allowing summary judgment on negligence claim premised on college’s failure to educate students, including plaintiff, about the increased risk of sexual assault due to drinking). 
 Plaintiff argues that the facts of this case are distinguishable because, as in Mullins, the University RAs’ acts and omissions placed her in harm’s way and thereby created the very situation that caused her harm. This argument both misapprehends the essential teaching of Mullins,[7]and misapplies its holding to materially different facts. Notably, none of the RAs provided Plaintiff with the alcohol that she consumed that night, nor did they ignore signs that would have alerted them that the assailant might sexually assault Plaintiff. The RAs’ presence at the party, their participation in underage drinking, and their failure to assist Plaintiff once she was intoxicated did not, taken singly or together, impose a duty on NU to safeguard Plaintiff from a sexual assault that might occur after she became voluntarily intoxicated. Nor do these facts demonstrate that NU itself caused the situation that led to the Plaintiff’s harm. The sexual assault was committed by a third party, in a different place, and in private. The University’s failure to put a stop to Plaintiff’s drinking that evening cannot be considered to have placed her in harm’s way in the manner contemplated by Mullins. See, e.g., Freeman v. Busch, 349 F.3d 582, 587-89 (8th Cir. 2003) (university could not be held liable after on-duty RA failed to assist an intoxicated guest at a dorm party, when that guest was later sexually assaulted by the party host who was also an off-duty student security guard); Beach, 726 P.2d at 419 (university did not have duty to protect underage students from their voluntary off-hours intoxication during a school-sponsored field trip, even where a tenured professor was present and drinking). At the very most, Plaintiff has demonstrated not that NU was the cause of her harm in any legal sense, but only that it tolerated underage drinking by adult students. As discussed above, however, the University has no affirmative duty to prevent such commonplace conduct. See Nguyen, 479 Mass. at 451 ("[T]he modern university-student relationship is respectful of student autonomy and privacy.").
 Moreover, and unlike in Nguyen, there is no evidence in the record to suggest that NU had any knowledge that the assailant posed a foreseeable risk of assaulting other students. It is undisputed that the NUPD was aware of no incident reports or allegations that the assailant had ever assaulted, sexually or otherwise, anyone previously. Further, it is undisputed that "[t]here was no reason for anyone at [NU] to be concerned about [the assailant] as of October 31, 2013." (SMF ¶ 33.). Compare Schaefer v. Fu, 272 F. Supp. 3d 285, 288-89 (D. Mass. 2017) (university may be negligent when plaintiff informed two professors of assailant’s disruptive behavior targeted at her, and one professor acknowledged familiarity with assailant’s behavior prior to the assault). In the present case, Plaintiff arrived at the party in the company of the assailant, and then left with him willingly. No one else at the party expressed any doubts or concerns about permitting the assailant, with whom Plaintiff was obviously acquainted, to walk her back to the dorm where they both lived. There is no evidence in the record that the assailant was touching Plaintiff inappropriately at the party, or that he engaged in any another conduct that might reasonably have given rise to a concern for Plaintiff’s safety. Accordingly, NU lacked the requisite fore-knowledge of the assailant’s potential for abusive conduct such as would impose a duty on it to prevent the Plaintiff’s harm.
 For all of these reasons, the Court concludes that no special relationship between Plaintiff and NU existed such that the University can be held liable for the sexual assault perpetrated by another student. See Doe v. Brown Univ., 304 F. Supp. 3d 252, 261 (D. R.I. 2018) (no special relationship existed between university and student such that university could be held responsible for sexual assault committed by another student after plaintiff was drugged at an on-campus fraternity party).

 b. Foreseeability

 Plaintiff’s negligence claim fails for the additional reason that wholly absent from the record is evidence that the assailant’s abuse was reasonably foreseeable (to anyone) before the assault occurred inside the assailant’s dorm room. The fact that two undergraduate students who were acquainted with one other were drinking at a party, one became intoxicated, and the other offered to walk her home is a routine and unexceptional occurrence on today’s college campuses. The law cannot rationally be stretched so far as to impose liability on colleges to prevent all instances of this sort, merely in consideration of the possibility that one student may sexually assault another. See Facchetti v. Bridgewater Coll., 175 F. Supp. 3d 627, 644 (W.D. Va. 2016) (college could not have foreseen sexual assault when plaintiff invited assailant to stay in her room and assailant had no prior history of committing assaults); Murrell v. Mount St. Clare Coll., No. 3:00-CV-90204, 2001 WL 1678766, at *4 (S.D. Iowa Sept. 10, 2001) (Pratt, J.) ("A college, or any other kind of landlord, is incapable of foreseeing an acquaintance rape that takes place in the private quarters of a student or tenant, unless a specific student or tenant has a past history of such crimes."); Tanja H. v. Regents of Univ. of California, 228 Cal. App. 3d 434, 438 (Cal. Ct. App. 1991), disapproved on other grounds by Regents of Univ. of California v. Superior Court, 413 P.3d 656 (Cal. 2018) (sexual assault committed after students consumed alcohol is not sufficiently foreseeable in the legal sense such that it should give rise to duty for college to protect against such assaults). See also Hernandez v. Baylor Univ., 274 F. Supp. 3d 602, 619 (W.D. Tex. 2017) ("Courts across the country have determined ... that the general foreseeability of sexual assault on campus is insufficient to warrant negligence liability."). NU thus did not have a duty to protect Plaintiff from a sexual assault perpetrated against her by another student. This follows both because the University was not in a special relationship with Plaintiff in these circumstances, and because the harm that Plaintiff actually suffered was not reasonably foreseeable to NU or its agents. 
The lack of foreseeable harm in this case likewise demonstrates that Plaintiff cannot establish another essential element of her negligence claim, viz., that any acts or omissions of NU were the proximate cause of her injuries. See, e.g., Davis v. Westwood Grp., 420 Mass. 739, 743 (1995) (in order to succeed on negligence claim, plaintiff must demonstrate that breach of a legal duty was the proximate cause of his injuries). See also Dubuque v. Cumberland Farms, Inc., 93 Mass. App. Ct. 332, 347 n.25 (2018) ("The question of foreseeability relates to both duty of care and proximate cause."); R.L. Currie Corp. v. East Coast Sand & Gravel, Inc., 93 Mass. App. Ct. 782, 784 (2018) (issue of proximate cause may be resolved as a matter of law at summary judgment stage when plaintiff has no reasonable expectation of proving that the injury was a foreseeable result of defendant’s negligence). Here, the sexual assault perpetrated against Plaintiff by the assailant cannot be considered a foreseeable consequence of NU’s failure to prevent her from consuming alcohol or its failure to intervene once aware that she was intoxicated. See Freeman v. Busch, 150 F. Supp. 2d 995, 1003-04 (S.D. Iowa 2001), aff’d on other grounds, 349 F.3d 582 (8th Cir. 2003) (RA’s failure to assist an intoxicated guest was not the proximate cause of a sexual assault later perpetrated against her by a resident in that RA’s dormitory). See also Doherty v. Emerson Coll., No. 1:14-CV-13281-LTS, 2017 WL 4364406, at *10 (plaintiff could not prove that university’s alleged failure to properly educate students about issues of consent, sexual assault, the high correlation between alcohol and sexual assault, and their Title IX rights was the proximate cause of the sexual assault perpetrated against her by another student).
 In sum, Plaintiff’s negligence claim – premised on NU’s alleged failure to protect Plaintiff from the criminal acts of third parties – fails as a matter of law both because NU had no such duty in these circumstances, and because any failures on the part of the University to this effect were not the proximate cause of foreseeable harm suffered by the Plaintiff.

 2. NU’s Vicarious Liability for the Acts or Omissions of its RAs

 Plaintiff’s argument that NU can be held vicariously liable for the acts or omissions of its RA fares no better. (See Pl.’s at Def.’s Mot. Summ. J., at 25-26.). Plaintiff contends that RAs at NU qualify as "student employees," and that the University can thus be held vicariously liable for the torts they commit within the scope of their employment. Even if Plaintiff were correct as to this point, her claim still fails for the same reasons as described above.[8]
Assuming that Anderson and Ward breached their duties under the "Resident Assistant Agreement" (the "Agreement") by hosting a party where underage drinking occurred and by failing to assist the Plaintiff once she was observed to be intoxicated, these actions and inactions were in all events not the proximate cause of the ensuing sexual assault. At most, Anderson and Ward permitted Plaintiff to become inebriated and then allowed her to leave a party with an acquaintance. That she was later sexually assaulted by that acquaintance in the privacy of his dorm room is not the foreseeable consequence of these Defendants’ arguably negligent conduct. Such lack of foreseeability is fatal to any negligence claim Plaintiff might raise based on the RAs’ conduct and, coextensively, to any cause of action asserted against NU under a vicarious liability theory arising out of that same conduct. See Elias v. Unisys Corp., 410 Mass. 479, 481 (1991) ("The liability of the principal arises simply by the operation of law and is only derivative of the wrongful act of the agent."); James-Brown v. Commerce Ins. Co., 85 Mass. App. Ct. 1111, 2014 WL 1325663, at *1 (2014) (Rule 1:28 decision) (quoting Mamalis v. Atlas Van Lines, Inc., 364 Pa. Super. 360, 364-65 (Pa. Super. Ct. 1987)) ("A claim of vicarious liability depends on the life of the claim from which it derives.").
 Accordingly, Plaintiff’s negligence claim against NU, premised on the theory that the University can be held vicariously liable for the acts or omissions of its RAs, fails as a matter of law.

 3. NU’s Duty to Adequately Train and Supervise its RAs

 Plaintiff next alleges that NU was negligent in the training and supervision of its RAs, who participated in underage drinking on the evening in question and failed to report such Code violations or obtain assistance for Plaintiff when she was visibly intoxicated. This negligence theory as applied to NU fails for many of the same reasons discussed above.
 "The torts of negligent hiring, retention, and supervision ordinarily relate to situations where ‘employees are brought into contact with members of the public in the course of an employer’s business.’" Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 613 (D. Mass. 2016) (quoting Vicarelli v. Business Int’l, Inc., 973 F. Supp. 241, 246 (D. Mass. 1997)). "In such circumstances, employers are responsible for exercising reasonable care to ensure that their employees do not cause foreseeable harm to a foreseeable class of plaintiffs." Roe No. 1, 469 Mass. at 714.
 Plaintiff’s negligent training and supervision claim thus fails for each of two independently sufficient reasons. First, as discussed supra, see Section II.A.1.b., it is not foreseeable as a matter of law that, standing alone, permitting underage drinking (even to the point of intoxication) would lead to a sexual assault, or that permitting an intoxicated person to walk home with an acquaintance would lead to such an assault. See Nelson v. Salem State Coll., 446 Mass. 525, 538 (2006) (essential element of negligent supervision claim is a causal relationship between the breach of duty and the harms suffered). Second, Anderson testified without contradiction that she was aware that excessive alcohol use violated the Code, and both Anderson and Ward testified that they had in fact received training on excessive alcohol consumption. (See J.A., Ex. 11, at 146:21-147:8, 167:8-21, 196:11-16; J.A., Ex. 12, at 137:5-21. See also SMF ¶¶ 9-14.). Whether these students neglected to utilize the skills they were taught during that training, or failed to acquire the necessary skills in the first instance, will not, without more, permit the inference that NU was negligent in providing the training itself. Moreover, to the extent that Plaintiff’s claim is premised on the supervisory conduct of these two particular individuals, there are no facts in the record to suggest that there was any basis upon which NU knew or should have known that there were problems (or failures of skill acquisition) with Anderson’s or Ward’s performance as RAs prior to the incident at issue. This deficit in the evidence is fatal to the Plaintiff’s negligent supervision claim. See Doe v. Brandeis Univ., 177 F. Supp. 3d at 614 (under negligent supervision theory, plaintiff must demonstrate facts that would show that university knew or should have known there were problems with employee indicating her unfitness to serve in role, and then failed to take appropriate action). 
 In sum, NU is entitled to summary judgment on Count I. This follows because the University had no legal duty to Plaintiff to prevent the harm that occurred, because the University cannot be held vicariously responsible for the acts and omissions of two student RAs on the facts of this case, and because the sexual assault committed was neither proximately caused by nor the foreseeable consequence of any of NU’s own conduct (including the conduct of its RAs).

B. Negligence Claim Against Defendants Antonucci and Jose (Count II)

 Plaintiff brings a negligence claim against Defendants Antonucci and Jose that also arises out of these RAs’ conduct on the night in question. Plaintiff asserts that Antonucci may be held liable, because she was personally responsible for training Anderson and Ward and for supervising Anderson; and Jose may be held liable for "creating an atmosphere where RAs were able to violate their employment obligations and [Code] rules with impunity, as well as for his personal failures to properly train and supervise RAs, including Anderson and Ward." (Pl.’s Opp’n to Defs.’ Mot. For Summ. J., at 37.). As discussed supra, see Section II.A.3., the undisputed evidence of record permits no reasonable inference that Anderson and Ward were negligently trained or supervised. Likewise, and as discussed supra, see id., the evidence in this case permits no reasonable inference that the sexual assault Plaintiff suffered at the hands of the assailant was a foreseeable consequence of (and thus proximately caused by) the negligence of these RAs. The negligence claim asserted against Defendants Antonucci and Jose thus fails as a matter of law.

C. Negligence Claim Against Defendants Sevigny,

 Wegmann and Estabrook (Count III) 
Plaintiff brings a negligence claim against Defendants Sevigny, Wegmann and Estabrook, on the grounds that they negligently administered and supervised the disciplinary proceedings against the assailant, and in this connection failed to properly train their staff and Board members on the Code.[9] Plaintiff fails to present a cognizable negligence claim, because a university has no duty in tort to its students to conduct disciplinary proceedings with due care. See Doe v. Trustees of Bos. Coll., 892 F.3d at 94-95 (university had no duty of care to an accused student to conduct disciplinary proceedings in a particular manner where contracts between the university and its students outlined the process to be followed); Doe v. Emerson Coll., 153 F. Supp. 3d at 515 (dismissing negligence claim of student who accused another of sexual assault, on the grounds that "Massachusetts does not ... impose a common-law or statutory duty on administrators to enforce university policies."). 

 The claim fails for the additional reason that the undisputed evidence shows that the Board members who served during the assailant’s disciplinary proceeding had received both a generalized training and a training focused on sexual misconduct charges, the definitions of consent and incapacitation, and the implications of alcohol and drug consumption in sexual assault cases. (See SMF ¶¶ 62-65.). Moreover, as discussed infra, see Sections II.E and II.F, Plaintiff has identified no procedural errors in the handling of her complaint. In point of fact, it is clear that the Board did consider the definition of "consent" and the effect of intoxication on Plaintiff’s ability to give consent to sex during their deliberations, notwithstanding Plaintiff’s contentions to the contrary. See infra notes 18-19.
 Sevigny, Wegmann and Estabrook, therefore, are entitled to summary judgment on Count III. Plaintiff has no claim sounding in negligence against these Defendants based on the disciplinary proceedings against the assailant, and has failed to identify any deficiencies in the training or supervision of the Board members or staff who were involved in this disciplinary process.

 D. Negligent Infliction of Emotional Distress Claim
 Against All Defendants (Count VII)
 Plaintiff alleges that the same conduct underlying her negligence claims caused her to suffer emotional distress. In order to prevail on a claim for negligent infliction of emotional distress, a plaintiff must prove: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Sullivan v. Boston Gas Co., 414 Mass. 129, 132 (1993) (quoting Payton v. Abbott Labs, 386 Mass. 540, 557 (1982)). For the reasons discussed supra, see Sections II.A through C, the Plaintiff’s claim is deficient as to the first and third elements. Plaintiff has failed to identify evidence from which a jury could reasonably find that these Defendants were negligent, or caused her to suffer a sexual assault, based on the cited conduct. See Doherty v. Emerson Coll., No. 1:14-CV-13281-LTS, 2017 WL 4364406, at *10 (claim for negligent infliction of emotional distress must fail when negligence claim based on same conduct fails). Accordingly, the Defendants are entitled to summary judgment on Count VII. 
E. Breach of Contract Claim Against NU (Count IV)

 Plaintiff brings a common law breach of contract claim against NU. This claim is premised on the assertion that Estabrook was not permitted to deny her appeal after the appeal had already been granted, and that, as a result, there was a lack of "basic fairness" in the subsequent proceedings because the audio-recording from the original Board hearing had been destroyed. NU counters that the Plaintiff has failed to demonstrate any breach of her contract with the University. The Court agrees.
 The terms of the claimed contract at issue in this case are those set forth in the portion of the Code that covers disciplinary proceedings.[10] "In reviewing a student’s breach of contract claim against his or her university, [courts] employ a reasonable expectations standard in interpreting the relevant contracts." Doe v. Trustees of Bos. Coll., 892 F.3d at 80. "Under this reasonable expectation standard, courts ask, in interpreting the contractual terms, ‘what meaning the party making the manifestation, the university, should reasonably expect the other party [, the student,] to give it.’" Walker, 840 F.3d at 61 (quoting Schaer v. Brandeis Univ., 432 Mass. 474, 478 (2000)). "In the context of disciplinary hearings, [courts] ‘review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules.’" Doe v. Trustees of Bos. Coll., 892 F.3d at 80 (quoting Cloud v. Trustees of Bos. Univ., 720 F.2d 721, 724-25 (1st Cir. 1983)). "[I]f the facts show that the university has failed to meet [the student’s] reasonable expectations, the university has committed a breach." Doe v. Trustees of Bos. Coll., 892 F.3d at 80 (quoting Walker, 840 F.3d at 61-62) (internal quotations omitted). Moreover, the courts must "‘examine the hearing’ afforded to the student ‘to ensure that it was conducted with basic fairness.’" Doe v. Brandeis Univ., 177 F. Supp. 3d at 594 (quoting Cloud, 720 F.2d at 725).[11]

 Plaintiff first contends that Estabrook’s action in requiring her to submit an amended request for appeal after the original appeal had been allowed by the Appeals Board was contrary to the Code’s directive that "[a]ll decisions of the Appeals Board are final." (J.A., Ex. 8 at 31.). In essence, Plaintiff’s position is that, once her first appeal was allowed, Estabrook was required to permit the new Board hearing to proceed notwithstanding the errors Plaintiff had identified with the review process. This position simply cannot be reconciled with what could have been Plaintiff’s (or the assailant’s) reasonable expectations when reading the Code. 
 Although Plaintiff argues that Estabrook had no authority whatsoever to alter the Appeals Board’s decision once it was issued to her, the "Decision-making Authority" section of the Code provides: 

The Vice President of Student Affairs is responsible for the overall administration of the Code of Student Conduct as well as the Student Conduct Process. Under the oversight of the Vice President for Student Affairs, the Director in the Office of Student Conduct and Conflict Resolution has been charged with the day-to-day responsibility for administering the Code of Student Conduct and the Student Conduct Process.
(Id. at 14.). Estabrook, the Associate Vice President for Student Affairs, was the person at NU designated to oversee the Appeals Board’s decision-making during the relevant time period, and that Code-conferred oversight necessarily included the authority to rectify errors in the process. (See J.A., Ex. 2 at 246:3-18.). Plaintiff cites to no evidence in the record conflicting with or casting doubt upon such a common-sense reading of the Code.
 Estabrook supportably identified two errors in the Appeals Board’s decision to allow the Plaintiff’s appeal. First, Plaintiff had not identified a proper basis upon which an appeal could be granted. The Code only affords a complainant in a case involving alleged sexual violence a right to appeal a Board decision based on: (1) "a procedural error that impaired ... her right to a fair opportunity to be heard;" (2) the availability of new information "that could not reasonably have been made available during the original hearing and may be sufficient to alter the original Student Conduct Board ... decision;" or (3) a request to review the sanction "because of extraordinary circumstances." (J.A., Ex. 8 at 30.). Here, Plaintiff’s appeal did not reference any of the above grounds, and was on this basis deemed deficient.[12]
 Second, Estabrook noted that the assailant had received no notice of Plaintiff’s request for an appeal, and was likewise afforded no opportunity to respond to it before the Appeals Board reached its decision. Plaintiff argues that the assailant’s lack of notice was not an error, because the Code does not expressly provide that the charged student must receive notice of a request for an appeal. While Plaintiff is correct that the Code then in effect lacked an express requirement that notice of an appeal be given to the assailant, that omission obviously did not prohibit NU from requiring that such elementally fair notice be given.[13] To conclude that Plaintiff was entitled to an ex parte appeal of a disciplinary decision concerning another student would defy logic, the due process-informed spirit of the procedures set forth in the Code, and any reasonable expectation of a complainant reviewing the Code. Where the charged student is the one who may be subject to sanctions as a result of disciplinary proceedings, notice to him is – as a matter of fundamental fairness inherent in any college process – essential prior to the Board hearing and any related appeal. See Doe v. Western New England Univ., 228 F. Supp. 3d 154, 175 (D. Mass. 2017) (insufficient notice of the charged misconduct that could result in a student’s discipline violates fundamental fairness of proceeding).
 Estabrook’s action in response to these two errors was plainly appropriate. She did not deprive Plaintiff of her right to appeal the Board’s decision, but merely afforded Plaintiff an opportunity to amend her request for an appeal and thereby ensure that the assailant received proper notice thereof. Plaintiff could not have held any reasonable expectation that she was entitled to more based on the procedures outlined in the Code. As such, no breach of contract claim can rest on Estabrook’s exercise of her broad authority over the administration of NU’s student disciplinary process.
 Plaintiff’s related argument that the hearings following Estabrook’s decision lacked basic fairness is similarly unavailing. Plaintiff expressly declined the opportunity to review the audio- recording of the Board’s initial hearing prior to filing her request for appeal. Nevertheless, Plaintiff argues now that, had the recording been available to her while preparing her amended request, she could have identified procedural errors that would have given rise to a meritorious appeal. While the Court agrees that destroying the audio-recordings of disciplinary hearings prior to the exhaustion of all appeals therefrom is not best practice, the Court does not agree that such practice renders all subsequent proceedings fundamentally unfair. See Schaer, 432 Mass. at 482 ("A university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts."). Plaintiff herself actively participated in the Board hearing. Thus, to the extent the Board committed any procedural errors, such failures would have been clear to Plaintiff based on her own first-hand knowledge of the handling of her complaint and a review of the Code. The record in this case in all events demonstrates that the Board did, in fact, follow the procedures required by the University’s Code; and the only argument Plaintiff has advanced to the contrary concerns actions taken after the Board reached its exonerating decision concerning the assailant.[14] The Court, therefore, cannot conclude that NU’s disciplinary proceedings in this case lacked fundamental fairness to the Plaintiff. 
 Plaintiff’s breach of contract claim fails for the additional reason that Plaintiff seeks only to recover damages for the emotional distress that she suffered during the disciplinary proceedings, and for the remainder of her freshman year when she continued to live uneasily in the same dormitory with the assailant. As NU rightly notes, "damages for mental suffering are generally not recoverable in an action for breach of contract." John Hancock Mut. Life Ins. Co. v. Banerji, 447 Mass. 875, 888 (2006). Such damages are only recoverable in the limited instances where emotional harm results from physical injury, or when it is "the result of intentional or reckless conduct of an extreme and outrageous nature." Id. Here, Plaintiff does not allege that she suffered any physical harm from the University’s process in addressing her complaint against the assailant; nor does she allege any intentional or reckless conduct on the part of NU during the handling of her claim or thereafter. Thus, Plaintiff does not seek to recover damages that are cognizable in a breach of contract claim. 
 For all these reasons, NU is entitled to summary judgment on Count IV.
F. Title IX Claim Against NU (Count V)

 Plaintiff next asserts that the manner in which NU conducted its disciplinary proceedings violated Title IX. To demonstrate liability under Title IX, a plaintiff must show "(1) that [she] was a student, who was (2) subjected to harassment (3) based upon sex; (4) that the harassment was sufficiently severe and pervasive to create an abusive educational environment; and (5) that a cognizable basis for institutional liability exists." Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002). "To satisfy the fifth part of that standard, a plaintiff must show that a school official authorized to take corrective action had ‘actual knowledge’ of the sexual harassment and either failed to act or exhibited ‘deliberate indifference’ to it." Doe v. Emerson Coll., 271 F. Supp. 3d 337, 354 (D. Mass. 2017). "Deliberate indifference in the case of student-on-student harassment requires that the school’s ‘response (or lack thereof) is clearly unreasonable in light of the known circumstances.’" Doherty v. Emerson Coll., No. 1:14-CV-13281-LTS, 2017 WL 4364406, at *7 (quoting Porto v. Tewksbury, 488 F.3d 67, 73 (1st Cir. 2007)). A university will not be held liable if it takes "timely and reasonable measures to end the harassment." Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999).
 At the outset, the Court questions whether Title IX affords the Plaintiff, as the accuser, a right to press a claim in the absence of any post-report harassment or mistreatment. See Davis, 526 U.S. at 645 ("[D]eliberate indifference must, at a minimum, ‘cause [students] to undergo’ harassment or ‘make them liable or vulnerable’ to it.").[15] Two federal district court recently certified this precise question to their respective circuit courts of appeal after recognizing the absence of clear authority on the issue and the existence of colorable arguments on both sides. See Kollaritsch v. Michigan State Univ. Bd. of Trustees, 285 F. Supp. 3d 1028 (W.D. Mich. 2018) (certifying question of whether "a plaintiff [must] plead, as a distinct element of a Title IX claim, that she suffered acts of further discrimination as a result of the institution’s deliberate indifference, rather than alleging mere vulnerability to further acts of discrimination"); Weckhorst v. Kansas State Univ., No. 16-CV-2255, 2017 WL 3701163, at *6 (D. Kan. Aug. 24, 2017) (certifying question of whether a plaintiff must show "as a distinct element of her Title IX claim, that the [university’s] deliberate indifference caused her to suffer actual further harassment, rather than alleging that [the university’s] post-assault deliberate indifference made her ‘liable or vulnerable to’ harassment").[16]
 Some courts have found in circumstances similar to those at issue here that a plaintiff left open or "vulnerable" to harassment or assault due to a university’s deliberate indifference has an actionable Title IX claim even if no further harassment or assault in fact occurs. See Weckhorst, 241 F. Supp. 3d at 1171-75 & nn.92-93 (holding that a plaintiff must allege that a university’s "alleged deliberate indifference left her ‘liable or vulnerable to’ further assault or harassment, [even if plaintiff does not] additionally allege that post-report assault or harassment actually occurred") (collecting cases). It is the undersigned’s view, however, that no such claim can properly lie. The Court recognizes that a college or university may respond inadequately to a charge of sexual harassment (e.g., fail to carry out a satisfactory investigation, fail to conduct a proper hearing, and the like), and thereby leave a dangerous predator free to harm his victim further. In the event such harm at the hands of the accused comes to pass, the Court has no difficulty seeing that the school can and should be held accountable for the further and foreseeable injury to an accusing party whom it has failed to protect in circumstances where it knew or should have known protection to be required. Relief is awarded, however, not for the failure of the investigative/disciplinary process itself, but for the ensuing harm that the Plaintiff suffered and that was allowed to occur because of the school’s failures in process. This, of course, is consistent with the elemental requirements of proximate cause and foreseeability of harm in all civil tort actions.[17] But where, as here, there is no ensuing harm that flows from the University’s actions or inactions, no claim should logically avail based on an accuser’s dissatisfaction or discomfort with the manner in which the school administered its disciplinary proceedings.
 Given that the question concerning the necessity of demonstrating post-report harassment "is difficult and has little direct precedent," see Kollaritsch, 285 F. Supp. 3d at 1031, the Court does not (and need not) render its ruling on this ground alone. Plaintiff’s Title IX claim in all events fails as a matter of law, because Plaintiff has not and cannot prove that NU exhibited "deliberate indifference" to her report of sexual assault. See Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 649 (1999) (court may determine at summary judgment if a university’s response was not clearly unreasonable as a matter of law). In the case at bar, the record demonstrates that NUPD promptly responded to Plaintiff’s complaint of sexual assault by accompanying her to the hospital for an examination, and then by initiating an investigation of the assailant. At the conclusion of NUPD’s investigation, approximately three weeks after Plaintiff first made her complaint, disciplinary proceedings against the assailant commenced, and Plaintiff was afforded an opportunity to be heard at those proceedings. The Board then notified Plaintiff of its decision, and Plaintiff exercised her right to appeal that decision. Throughout the NUPD investigation, the ensuing disciplinary proceedings, and thereafter, NU imposed a "no contact" order between Plaintiff and the assailant which neither party violated during the entirety of Plaintiff’s tenure at the University. NU additionally offered Plaintiff the option to move to a different dorm, and to transfer out of the lone class she was then taking with the assailant. Plaintiff declined these protective measures, and her counsel acknowledged at hearing that they proved to be unneeded.[18] See Leader v. President & Fellows of Harvard Coll., No. 16-10254, 2018 WL 3213490, at *4 (D. Mass. June 29, 2018) (Casper, J.) ("Harvard provided [plaintiff] with a range of options, including removing herself from the shared house [with her harasser]; although [plaintiff] ... would have preferred that the putative harasser be required to move instead, Harvard’s conduct does not rise to the level of deliberate indifference because it did not provide that option.").
 NU’s response to Plaintiff’s complaint was timely and appropriate and, therefore, does not fail Title IX’s "clearly unreasonable" standard as a matter of law. See, e.g., Tubbs v. Stony Brook Univ., 343 F. Supp. 3d 292, 316 (S.D.N.Y. 2018) (disciplinary procedure not clearly unreasonable when university met its notice requirements, conducted an investigation, and arranged for a hearing, even if the hearing was "flawed and imperfect" because alleged assailant was permitted to question complainant); Facchetti, 175 F. Supp. 3d at 637 (university’s response to sexual assault complaint was not clearly unreasonable, when school quickly interviewed alleged assailant, held a hearing, and took disciplinary action against him even when plaintiff was afforded no notice of the hearing or the university’s decision); Butters v. James Madison Univ., 208 F. Supp. 3d 745, 762 (W.D. Va. 2016) (university’s response to claimed assault was not clearly unreasonable when school initiated disciplinary proceedings upon receipt of a formal complaint and ultimately disciplined assailants). 
 Plaintiff points to what she contends are two specific deficiencies in NU’s handling of the assailant’s disciplinary proceedings; but neither rise to the level of deliberate indifference or manifest unreasonableness. See Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 174 (1st Cir. 2007), rev’d on other grounds, 555 U.S. 246 (2009) ("Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, [or] to craft perfect solutions."); Butters, 208 F. Supp. 3d at 763 ("[W]hether [a university] could have designed a more victim-friendly system, whether it could have taken steps to protect [the complainant] better, or even whether [the university] followed its own policy to the letter, are not dispositive" of the issue of whether the university’s response was clearly unreasonable). 
 Plaintiff first argues that Board members were improperly trained on the definition of "consent," and on the effect of one’s incapacitation on his or her ability to furnish consent to sex. It is clear from the record, however, that all students who sat on the Board did receive such training, and that students who participated in sexual assault-based disciplinary hearings were required to complete supplemental training tailored to sexual assault. (See J.A., Ex. 23, at 62:5-16.)[19] Moreover, the students who sat on the Board during the disciplinary proceedings at issue in this case did, in fact, consider the issue of whether Plaintiff could provide proper consent given her state of intoxication at the time.[20] While inadequate training may give rise to a Title IX claim in certain limited circumstances, this is not a case where "a reasonable juror could conclude on the evidence that any inadequacies in training were so deficient that they constituted ‘encouragement of the [harassing] conduct’ or otherwise amounted to deliberate indifference." Doe v. Emerson Coll., 271 F. Supp. 3d at 357 (quoting Simpson v. University of Colo. Boulder, 500 F.3d 1170, 1177 (10th Cir. 2007)) (no deliberate indifference when students received training on issues related to Title IX, including on sexual harassment and student conduct proceedings).
 Plaintiff next contends that Estabrook for some reason lacked the authority to deny her appeal after it had been initially granted by the Appeals Board. As discussed supra, however, see Section II.E, Estabrook’s action was not a violation of NU policy. Estabrook articulated two reasonable bases for her decision: Plaintiff had not specifically identified either a procedural error or new evidence that could serve as a basis for allowing an appeal; and the assailant had not received fair notice of the appeal or an opportunity to respond to it. Furthermore, Estabrook’s decision did not have any preclusive effect on the Plaintiff’s appeal, as Plaintiff was allowed to resubmit her request for Board review (albeit on more limited grounds). The Court discerns no transgression of either the University’s Code or basic fairness in any of this.[21]
 Plaintiff obviously takes strong exception to the outcome of NU’s disciplinary proceedings, and believes that the University should have found sexual misconduct and expelled the assailant. Even in the context of Rule 56, however, the facts of record make clear that Plaintiff’s dissatisfaction with NU’s handling of her complaint cannot give rise to a cognizable Title IX claim. See Davis, 526 U.S. at 648 (Title IX complainant "lacks [the] right to make particular remedial demands."); Roe v. Pennsylvania State Univ., No. 18-2142, 2019 WL 652527, at *11 (E.D. Pa. Feb. 15, 2019) (Kelly, J.) (recognizing that Title IX vests no right in a complaining party to challenge the allegedly erroneous outcome of disciplinary proceedings initiated against another student).[22] This is so because "[f]ederal law gives school officials wide discretion in making disciplinary decisions, especially as they have to balance the interests of all concerned." Doe v. Galster, 768 F.3d 611, 621 (7th Cir. 2014).[23] In the absence of deliberate indifference, and such is the case here, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." Id. at 617 (quoting Davis, 526 U.S. at 648). See also Estate of Lance v. Lewisville Indep. Sch. Dist., 743 F.3d 982, 996 (5th Cir. 2014) (recognizing that "[j]udges make poor vice principals" in the context of evaluating disciplinary decisions in the Title IX framework); S.B. ex rel. A.L. v. Board of Educ. of Harford Cty., 819 F.3d 69, 77 (4th Cir. 2016) (internal quotations and citations omitted) ("[A]dministrators are entitled to substantial deference when they calibrate a disciplinary response to student-on-student ... harassment, ... and a school’s actions do not become ‘clearly unreasonable’ simply because a victim or his parents advocated for stronger remedial measures.").
 Plaintiff’s Title IX claim also fails for the additional reason that she has not demonstrated that any actions or inactions of the University related to her claimed sexual assault had "the systemic effect of denying [Plaintiff] equal access to an educational program or activity." Roe v. Pennsylvania State Univ., No. 18-2142, 2019 WL 652527, at *5 (quoting Davis, 526 U.S. at 652) (emphasis added) (noting that the Supreme Court expressly recognized this standard in cases involving a single instance of student-on-student sexual harassment). See Davis, 526 U.S. at 653 ("By limiting private damages actions to cases having a systemic effect on educational programs or activities, we reconcile the general principle that Title IX prohibits official indifference to known peer sexual harassment with the practical realities of responding to student behavior, realities that Congress could not have meant to be ignored."). Plaintiff has cited the Court to records reflecting that, during counseling, she expressed distress and frustration over the interim measures afforded to her by NU and over the University’s disciplinary proceedings more generally. (See Ex. to Pl.’s Br. in Resp. to Court’s Procedural Order). Plaintiff has not, however, demonstrated that this distress and frustration had any effect on her education, including on her grades, class attendance, ability to graduate, and the like. Plaintiff’s claimed psychological discomfort alone will not suffice to trigger a Title IX violation. See Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163, 315 F.3d 817, 823 (7th Cir. 2003) (no concrete, negative effect on education when plaintiff was "diagnosed with some psychological problems" following harassment). 
 In accordance with the foregoing, NU is entitled to summary judgment on Count V of the Complaint. Plaintiff has not and cannot demonstrate deliberate indifference on the part of the University in connection with her report of sexual assault, a fact fatal to her claim under Title IX. Nor can she demonstrate that the isolated conduct at issue had the systemic effect of denying her educational access, an adequate and independent ground for dismissing this claim.
G. Massachusetts Equal Rights Act Claim Against All Defendants (Count VIII)

 Finally, Plaintiff brings a gender discrimination claim against all Defendants under the MERA. In relevant part, the MERA provides: "All persons within the commonwealth, regardless of sex ..., shall have ... the same rights enjoyed by white male citizens, to make and enforce contracts, ... and to the full and equal benefit of all laws ...." G. L. c. 93, § 102(a). Plaintiff again rests her claim on the contention that Estabrook improperly denied her the benefits of her contractual relationship with NU, and that NU inadequately trained its Board and professional staff to handle her sexual assault complaint. (See Pl.’s Mem. in Opp’n to Def.’s Mot. Summ. J., at 39-40.) As discussed ante, Plaintiff has not demonstrated either a breach of contract based on Estabrook’s actions, or based on the inadequate training of University staff. Plaintiff’s MERA claim, therefore, premised as it is on the same conduct, must also fail. The Defendants are entitled to summary judgment on Count VIII.
CONCLUSION AND ORDER 

 For the foregoing reasons, Defendants’ Motion for Summary Judgment is ALLOWED. Judgment shall enter for the Defendants on all claims. 

SO ORDERED.
@/s/Robert B. Gordon Justice of the Superior Court
@March 8, 2019

xxz